BAR ASSOCIATION OF THE CITY OF BOSTON *vs.* ELISHA
GREENHOOD.

Suffolk.    March 4, 6, 1896. — March 22, 1897.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP,
& BARKER, JJ.

*Disbarment of Attorney — Common Law and Statute — Specifications of Charges
— Finding of Guilty of Deceit, Malpractice, and Gross Misconduct in
Office.*

If the provision of Pub. Sts. c. 159, § 39, relating to the removal from office of an
attorney at law, was intended to cover only deceit or misconduct in the perform-
ance of his official duties, it does not limit the power of the court, at common
law, to remove an attorney from his office, either permanently or temporarily,
for crime or other gross misconduct not connected with any official act.

Under Pub. Sts. c. 159, § 39, as well as at common law, the removal of an attorney
from office may be absolute, leaving him to apply to the court for readmission
if his offence was of such a kind that, after a lapse of time, he can satisfy the
court that he has become trustworthy; or for a stated time, if the court is of
opinion that the interests of the public will thereby be sufficiently protected.

It is enough if the respondent in a petition for his removal from the office of an
attorney at law is reasonably and definitely informed of the matters alleged
against him, and given an opportunity of being heard upon them; and if the
general charge is in proper form, it is immaterial that the specifications are not
proved exactly as alleged.

An attorney at law, who was retained to contest the allowance of a will, drew an
instrument and signed it in behalf of his clients, by the terms of which A., the
other party to it, agreed to aid them to the utmost of her power in the contest,
and, in the event of success, A. was to receive a certain sum, and they a certain
proportion each of the net amount obtained. In pursuance of this agreement,
A., who had lived in the testator's family for a considerable time before his
death, interviewed witnesses and aided in procuring evidence. The attorney,
although he had a duplicate of the agreement in his possession, did not make
known its existence, but, without disclosing that A. had an interest of this kind,
called her as a witness at the trial, and she gave material testimony upon the
subject of the testator's mental condition; and when the existence of the paper
was finally shown, on cross-examination, and the judge requested that it be pro-
duced by the witness, and understood that she would produce it, the attorney
sent her away, telling her that when he wanted her again he would send for
her. Four days later, the witness not having returned, the attorney, being
called upon for an explanation, said that he had a duplicate of the original
among his papers in court, and he then searched for it, but did not find it; and
the paper was not exhibited until two days later, when the witness returned to
the court and produced it. Upon the trial of a petition for the disbarment of
the attorney, the judge found that he tried to suppress the evidence in question,

and that he was guilty of deceit, malpractice, and gross misconduct in his office. *Held*, that the finding was warranted.

An attorney at law, who was counsel for certain legatees under a will, knew when the executor filed his first account that he had failed to charge himself with as much by a certain sum for stock which he had sold as he ought to have done. The executor owed the attorney a sum of money which he declined to pay unless the attorney would assent to the allowance of the account in behalf of his clients. The attorney thereupon signed his assent in their names, obtained his pay, and the account was allowed. Upon the filing of the second account, he wrote to the executor's counsel, threatening the executor with an attack unless he paid the amount which his clients should receive, and proposing to keep the whole matter a secret if a payment was made. Upon the trial of a petition for the disbarment of the attorney, he testified that, when he assented to the first account, he intended, if his clients would authorize him so to do, to object to the allowance of the second account when filed, unless the executor would correct, to the extent of the interest of his clients, the first account. The judge found that he was guilty of deceit, malpractice, and gross misconduct in his office. *Held*, that the finding was warranted. FIELD, C. J., HOLMES & MORTON, JJ., dissenting upon the ground that the report of the judge showed that his judgment upon the specifications relating to this part of the case went upon a finding that the charges in those specifications were true as alleged, and was not reached from the point of view taken by the decision.

If, upon the trial of a petition for the disbarment of an attorney at law, the facts found, with the inferences that may be drawn from them, warrant a finding that he was guilty of deceit and gross misconduct in his office, it is immaterial that, in making his findings of fact, the judge has not attempted to make a complete analysis of the conduct described, nor to state all the particulars in which it was culpable.

PETITION to the Superior Court for the removal of the respondent from the office of an attorney at law.

The petition, after alleging that the respondent was admitted as an attorney by the Supreme Judicial Court on January 20, 1885, and that he " has ceased to be of good moral character, and has been guilty of deceit, malpractice, and other gross misconduct," contained thirteen specifications of charges, the first, third, fourth, and fifth of which only need be stated, and were, in substance, as follows.

1. In or about 1892, one Howard Gill, of Dedham, died, leaving an instrument purporting to be his last will, and duly executed. The will was offered for probate by one Elijah W. Bonnemort, named as executor and principal legatee therein, and was duly admitted to probate. Certain of the heirs of Gill appealed from the allowance of the will, and the matter of their appeal came on in due course to be heard in the Supreme Judicial Court, before a jury, upon issues duly framed.

The issues raised the question of competency and soundness of mind on the part of the testator at the time of the making of the will. The respondent acted as attorney for the appellants. Shortly before the trial of the appeal, professing to act in behalf of the contestants or certain of them, he made an agreement in writing with one Florence Lowe, to the effect that she should do all that was in her power to aid the appellants in their appeal, and that, in case they should succeed in defeating the probate of the will, she should receive the sum of $500 as her compensation, and that certain relatives of Lowe should receive certain pecuniary advantage.

At the time of making the written agreement, it was known and agreed between the respondent and Lowe that she was to be and should be a witness for the appellants; that she should, at the trial of the appeal, testify to facts tending to show mental unsoundness and incapacity of the deceased at the time of the making of the will; and that such proposed testimony by her was part of the service contemplated by the agreement. Thereupon, and pursuant to the terms of the agreement, Lowe immediately proceeded to secure witnesses upon that point for the appellants, and procured numerous persons to testify thereupon in favor of the appellants. At the trial of the appeal, Lowe was called by the respondent as a witness, and testified to facts tending to show such unsoundness of mind and testamentary incapacity on the part of the deceased. The agreement with Lowe and her pecuniary interest in the result of the appeal were concealed by her and the respondent from the court and the jury, and the respondent, by so calling her as a witness, and by the concealment of the fraudulent agreement, falsely and fraudulently represented to the court and to the jury that no such agreement had been made, and that she was an ordinary witness not biased by pecuniary interest in the result of the controversy; and the fact of the agreement was disclosed to the court and the jury only by means of the cross-examination of Lowe by counsel for the appellee, and by an order of the court for the production of the written agreement. The agreement was produced only pursuant to the order of the court, and against the protest of the respondent. The agreement tended to the commission of perjury, and was unlawful, corrupt, and

fraudulent, and the calling of Lowe as a witness, and the concealment of and failure by the respondent to disclose the fact of such agreement was a corrupt and fraudulent practice upon the court and the jury.

3. Shortly prior to May, 1894, one William Dunn of Hyde Park, died intestate. His will was duly admitted to probate, and one Henry A. Rich was duly appointed and qualified as executor thereof. In the Probate Court, in the proceedings relating to the settlement of the estate of Dunn, the respondent acted as attorney for three legatees under the will. Among the assets in the hands of Rich, as such executor, were thirty-six shares of the capital stock of a corporation named the American Tool Company, which were set forth in the executor's inventory, and were duly appraised at $4,680, that is, at $130 per share. Thereafter it became and was necessary and proper, and it was desired by all the beneficiaries of the estate, that Rich as such executor should sell all the stock for the settlement of the estate, and he thereupon determined to sell the same. The principals of the respondent were, under the will, entitled to share, in certain proportions, in the proceeds of the stock. The respondent thereupon, fraudulently devising and contriving to cause Rich, as such executor, to be charged in the probate proceedings in case of a sale of such stock for more than the amount of his proper liability in respect thereof, and for a sum greater than he should, in the exercise of due diligence and fidelity, receive for the stock, and believing that he would not be able to obtain for the stock more than $175 per share, fraudulently conspired with one John W. Chase, that Chase should send to Rich, as such executor, a written offer for the purchase by Chase from Rich of all the stock at the price of $200 per share; that Chase should thereafter ever refuse to carry out the offer, and that, in case of the sale of the stock by Rich at a price less than $200 per share, they should falsely and fraudulently pretend and assert to Rich and to the Probate Court that Chase had made the offer in good faith, and had ever been willing and ready and able, and had ever offered to carry out the same, and that Rich had fraudulently refused to accept the same, and in selling such stock for less than $200 per share had acted fraudulently, and had fraudulently diverted from the estate

the difference between such sum as he should actually have received and the amount of Chase's offer.

Chase was not then of pecuniary ability to carry out such offer, and this he and the respondent then well knew. Pursuant to the false and fraudulent conspiracy, Chase, at the request of the respondent, and with his knowledge, thereupon sent to Rich, as such executor, a written offer, signed by Chase, to the effect that he would purchase of Rich, as such executor, all the stock at the price of $200 per share, or at a higher price, if a higher price should be necessary to the securing of such stock by Chase. Chase and the respondent both then intended that the offer should not be carried out by Chase. Rich received the written offer, and forthwith offered to sell to Chase all the stock at $200 per share, but Chase refused to comply with the offer or to buy the stock. Rich, as such executor, thereupon received an offer of $175 per share for all the stock from a person of pecuniary ability. In Rich's judgment it was advisable to accept the offer, and due diligence and regard for the interests of the estate required that he should accept it. Before accepting the same, he notified Chase thereof, and again offered to him the stock for $200 per share, and he then notified the respondent, as attorney for the legatees, of the offer of $175 per share, and his inability to find a purchaser at a higher price, and of his intention to accept the offer unless a higher price could be obtained by the respondent or by other beneficiaries of the estate.

Neither the respondent nor any of the persons so represented by him objected to the acceptance of the offer, or procured or pointed out the means of obtaining a higher price ; but the respondent then expressly stated to Rich that the latter, in determining upon the question of accepting the offer of $175, must act upon his own sound judgment. Rich thereupon, using due diligence and skill, accepted the offer of $175, and sold all the stock at that price. After making such sale Rich duly filed in the Probate Court an account of his executorship, setting forth the sale at such price, made due oath to the account, and prayed to have it allowed. The respondent, assuming to act in behalf of his principals, assented in writing to the allowance of the account, and on May 3, 1893, the account was allowed, without objection from him or them. Thereafter,

on or about April 4, 1894, Rich, as such executor, made a second account of his executorship, charging himself with the balance shown by the first account, and no more, and making no specific reference to such shares, and on the day last named he made oath before a justice of the peace that the same was just and true.  By the filing of the second account, the first account was opened, and the allowance of the first account became and was pending before the Probate Court.  Thereupon, and pending the matter of the allowance of the accounts, and before hearing thereon, the respondent, pursuant to such false and fraudulent conspiracy, informed Rich that he, the respondent, knew of the offer of Chase; falsely and fraudulently pretended to Rich that he, the respondent, believed it to have been a genuine and available offer; falsely and fraudulently represented and pretended to Rich that it was not an offer instigated by the respondent, but that it was, and that he believed it to have been, an independent offer of Chase; fraudulently demanded of Rich that he should account to the estate for the stock, or for proceeds thereof, at the rate of $200 per share; and fraudulently threatened, in case such demand was not complied with, to oppose the allowance of the accounts, in respect of the stock, and to contend in the Probate Court that Rich had wilfully and fraudulently declined a genuine offer for the stock of $200 per share, had fraudulently sold the stock at a less rate, and had thereby fraudulently diverted from the estate the sum of $900.

4.  Certain legatees under the will, entitled to share in the proceeds of the stock, were not represented in the probate proceedings, or otherwise, by the respondent.  At the time of making such fraudulent demand upon Rich, the respondent fraudulently offered to him that if he would pay to the respondent's three principals their respective net shares of the sum of $900, so alleged by the respondent to have been fraudulently diverted, he would, in their behalf, accept the same in full satisfaction of his demand; that he would, and his principals should, keep such transaction secret from their co-legatees, and that his principals should, or that he would in their behalf, assent in the Probate Court to the allowance of the accounts then on file, and would thereby join Rich in deceiving the co-legatees, and in

fraudulently effecting the allowance of the accounts by the Probate Court, and would join Rich in falsely and fraudulently pretending to such co-legatees in and by the accounts so to be assented to that the respondent's principals were content with and had acquiesced in the sale set forth in the accounts and had been settled with by Rich upon that basis and no other, and that he would join Rich in deceiving the Probate Court in respect of the accounts, and would falsely and fraudulently represent to the court that he and that his principals believed the accounts to be just and true, and that he would thereby aid the executor in availing himself of his oath thereto, alleged by the respondent to be false.

5. Pending the allowance of the accounts, and at the time of making such demand and proposals to Rich, the respondent wrote and caused to be delivered to one Edmund P. Davis, then the attorney of record of Rich as such executor in the probate proceedings, and then the adviser of Rich, as such executor in the premises, as the respondent then well knew, a letter addressed to Davis. The respondent, at the time of writing and causing to be delivered such letter, intended that the same should be shown by Davis to Rich, and believed that it would be so shown. The letter, which was dated May 1, 1894, and signed by the respondent, was as follows:

" Brother Davis, — I suppose, on the whole, it is fairer, and perhaps would be better all around, if I should tell you, as attorney for Mr. Rich, that as attorney for Arthur Dunn, John Dunn, and Mr. Tuttle, as executor of the will of Mary Muxworthy, who are familiar with the facts, I shall have to attack Mr. Rich's account and ask to have his accounts disallowed, on the ground of misconduct in his trust, either negligence or fraud.

" On January 2, 1893, it seems that Dr. John W. Chase, of Dedham, sent by registered letter an offer to Mr. Rich as executor, offering him $200 per share for the whole thirty-six shares of stock in the American Tool Company, and stating that he would pay more, if necessary, to get it. Instead of taking this offer or offering the stock at public auction, it seems that Mr. Rich, for reasons of his own, either made an actual sale or went through the form of a sale of this stock, for $175 per share, thus clearly depriving the estate of at least $900. Arthur Dunn says

that he told Mr. Rich that he would go $5 a share higher than any one else. The returns at the State House indicate that the stock was worth at that time over $300 per share. Dr. Chase tells me that Mr. Rich tried to side-track him by trying to induce him to buy the real estate as well as the shares, and he will be, in my judgment, a dead-open-and-shut witness against Mr. Rich upon this transaction, as he feels, with his knowledge of the case, that the estate has been treated in anything but a loyal manner by Mr. Rich. Now, the extent of my clients' interest, of course, is only thirty per cent. I know by Dr. Chase's offer that $900 more could have been realized at least for that stock than Mr. Rich accounts for. I have a private opinion that the loss to the estate is greater, but possibly that would be a matter of speculation, notwithstanding the returns of the State House would indicate a value of over $300. Thirty per cent dividends stock is not to be sneered at. If $200 be taken to be the basis of the stock, the interests of my clients would be $270. Now I have no personal feeling against Mr. Rich, and although my people do not naturally feel more kindly toward him through being informed of the condition above described, I feel quite sure no opposition will be made by them ; in other words, that they will assent to the account, if Mr. Rich will pay to me for them what in fact they have suffered from the transaction. I am not giving any information to, or acting for, any one but those three clients. Of course, if Mr. Rich prefers to have the whole thing gone into, it is his right, but I think that he will see that it is for his own interest to make a settlement without a trial."

In and by such letter the respondent did by a written communication, and with intent to extort money and pecuniary advantage, maliciously threaten Rich that he would accuse Rich of criminal offences, to wit, of embezzlement, or fraudulent conversion or appropriation of, and of fraudulently disposing of assets of the estate ; of fraud and malversation as an executor ; and of perjury in and by his oath to the probate accounts.

Hearing before *Braley*, J., who made the following findings.

The evidence wholly fails to show any conspiracy by Chase and the respondent, as set forth in the third charge, or to show any improper conduct whatever on the part of Chase.

The fourth and fifth specifications relate solely to the acts of the respondent. In passing upon them, the documentary evidence and the testimony of E. P. Davis, John W. Chase, and the respondent are considered. Chase, in good faith, made to Rich, as executor, an offer of $200 per share for the stock of the American Tool Company. This offer was never accepted by Rich, and he subsequently sold the stock for $175 per share. The stock was inventoried as worth $4,680, or $130 per share. There were other legatees under the will entitled to share in the proceeds of the stock, who were not represented in the probate proceedings or otherwise by the respondent. When Rich filed his first account as executor, on May 3, 1893, in the Probate Court, he accounted for the excess of the sale by him over the appraised value. To this account the respondent, representing his clients, and in their behalf, assented in writing, duly indorsed thereon, and the account was duly allowed on May 3, 1893. He testified that, when Rich should file his second account in the estate, it was his intention, if his clients would authorize him so to do, to object to the allowance of the second account, and make Rich account for his maladministration of the estate in the sale of the stock for a less sum than Chase had offered.

On April 4, 1894, the second account was filed, and the respondent alone appeared and asked for a hearing, and the account is now pending for allowance. On May 1, 1894, the respondent wrote to E. P. Davis, counsel for Rich, a letter, fully set out in specification five. The conduct of the respondent in so assenting to the account to which Rich had made oath that it was " just and true " tended directly to deceive the Probate Court as to the first account, and to enable the executor successfully to cover up what on the evidence in this case was maladministration of the estate, Chase at the time he made the offer being financially able and intending to carry it out and to purchase the stock ; and no good reason was shown why the offer should not have been accepted. The respondent knew that such assent would have that effect. He was, to some extent, influenced to so assent by the payment to him by Rich, as executor, of the sum of $500, " for services in protection of the estate," and so charged in the first account, and Rich and his counsel, Mr. Davis, used this promise of payment by Rich to the respondent to get

the latter's assent in behalf of his clients to the account. Such services had been properly rendered by the respondent, but Rich did not intend to pay therefor unless the respondent would assent to the account in behalf of his clients. His letter to Mr. Davis set out in specification five contained a fraudulent proposition, and also a threat to use his knowledge of the offer of Chase to Rich, not for the purpose of an honest settlement of the estate, but to gain an unlawful advantage for his clients, the effect of which would enable Rich thereby to escape an honest accounting of his trust in the Probate Court, and to defraud the other legatees. He intended to extort money and gain a pecuniary advantage by the threats therein contained. The charges set out in specifications four and five are fully proved.

This leaves specifications one and two of the petition to be considered. In June, 1893, Howard Gill, of Dedham, died, leaving an instrument purporting to be his last will, executed in July, 1892, which was duly offered for probate. This case, by proper proceedings, came on to be heard before a jury in the Supreme Judicial Court, in May, 1894, upon issues which raised the question of the testamentary capacity of the testator, and also whether the will had not been procured by fraud and undue influence practised upon him. The respondent appeared for and represented parties interested in Gill's estate as contestants. It appeared that some time prior to October 24, 1893, one Florence W. Lowe had some talk and correspondence with one of the contestants ; that for some time prior to the death of Howard Gill, she had lived in his family ; and that in January, 1891, he made a will, in which he devised, among other bequests, the sum of $500 to her. Upon consultation with counsel other than the respondent, she was advised that she had an interest in the contesting of the last will ; that if it should be set aside, the former will would be established, and she would receive the legacy. Such counsel saw the respondent in relation to the subject matter, and subsequently the respondent, acting, as he claimed, with full authority from his clients, made an agreement with her, the substance of which was that if the contestants succeeded in their contest by a decree against the last will, or by settlement, they would allow out of the sum received by settlement, or, if they succeeded other than by settlement, the sum of $500 to Florence

W. Lowe, and to Susan E. Lowe and P. M. Withington, all par-
ties to the agreement, jointly one seventh of whatever sum they
might receive, or one seventh the value of Gill's estate, after
deducting the sum of $500 to be paid to Florence W. Lowe, and
the expense of the contest; and further, Florence W. Lowe,
Susan E. Lowe, and Withington, who were parties of the second
part, " would, to the utmost of their power, aid said contestants
in the preparation and conduct of said contest of said will."

This agreement was executed in duplicate, one copy being
given to Florence W. Lowe, and the other retained by the
respondent.   At the time of the execution and delivery of this
agreement, the respondent did not know that Florence W. Lowe
would be a witness at the trial.   Acting in pursuance of this
agreement, Lowe did interview witnesses, and aided in the
obtaining of evidence for the contestants.   Subsequently, and
before the case came on for trial, the respondent ascertained
that Lowe had lived in the family of Howard Gill some time
prior to his death, and was familiar with his habits, and would
be a material witness as to his mental soundness at the trial of
the issues.   At the trial, the respondent, in examining the attest-
ing witnesses to the last will, brought out the fact of the prior
will, and that therein Lowe was a legatee in the sum of $500.
In his opening of the case to the jury on behalf of the contest-
ants, he alluded to the fact of the prior will, and that Lowe was
named as a legatee therein, but did not make any reference
directly or indirectly to the agreement.   Subsequently Lowe
was called as a witness by him in behalf of the contestants, to
prove the mental unsoundness of the testator at the time of the
execution of the last will; and she gave material testimony upon
this issue.   Upon the cross-examination, on May 25, Lowe was
asked if she had any interest in the case, and at first made replies
which tended to show that she had no interest except that which
might arise if the last will was set aside, when the prior will
might be established, and she might thereby receive her legacy.

Upon being pressed by counsel for the executor, she finally
disclosed the fact of the agreement in existence between her and
the contesting heirs.   The judge thereupon, on May 29, ordered
the agreement to be produced, and that Lowe should attend as
a witness with it.   After more or less delay, caused by the non-

attendance of Lowe, she came into court on May 31 and produced the agreement. The respondent testified at the hearing of this petition, that if Lowe had not disclosed the fact of such an agreement being in existence, he did not intend and had not intended at any time to call the attention of the court thereto. It further appeared that Lowe was in attendance as a witness, not on subpœna or in expectation of receiving witness fees ordinarily paid, but relying solely upon such remuneration as might be afforded her under and by virtue of the agreement. After the fact had become known to the court that such an agreement was in existence, Lowe was ordered to attend and produce it. This was on Friday, May 25. She did not appear on Monday, May 28. On May 29, the judge called for her, and said to the respondent, "I thought, Mr. Greenhood, I asked the question whether Miss Lowe would be here to-day, and you said she would." The respondent denied having said so, stating that he said, "If necessary," but the judge replied, "I understood you said she would." On May 29, the respondent said to the judge that he had a duplicate original with him in court; but upon searching among his papers he did not find it, and at no time after the disclosure of the fact of the agreement and pending the order that Lowe should come into court and produce the agreement did he offer to show the judge the duplicate in his possession. Lowe, after her cross-examination, was re-examined by the respondent, but only as to whom she had consulted in reference to the agreement, and he made no statement to the judge of his knowledge of or connection with the matter, or that he would endeavor to produce it. Lowe, upon leaving the stand, said to the respondent that she felt that her answers on cross-examination, so far as they related to her interest in the case, and preceding her disclosure of the agreement, were not right, and that she was disturbed by them. She was not certain whether she asked the respondent to be again called to the stand for the purpose of explanation or qualifying what she had said, and was not prepared to say in express terms what she did say. Without deciding the exact fact, she was not recalled, and no attempt was made by the respondent to explain or to change in any way what she had said. The respondent remarked to her after she had left the witness stand that she "had put him in a hard

place." It appeared that he was provoked and angry, and said " that when he wanted her again he would send for her " ; and that when he said to the judge on May 28, that he expected her the next day, he had told her she need not come until he sent for her, and he had not then sent for her, and when he after- wards did send for her she came.

The fact that such an agreement was in existence was material. evidence in the trial of the case, as affecting the credibility of the witness Lowe. From all the evidence the court is satisfied that the respondent did not desire the production of the agree- ment, and tried to suppress its appearing in evidence. The ageement in and of itself was not, as between Lowe and the contestants, immoral and against public policy. Florence W. Lowe did have an interest in the controversy by reason of the prior will and the bequest therein to her, and the subsequent expectation and knowledge of the respondent and herself that she would be called as witness for the contestants was not equiv-- alent to a contract to that effect.

There is no evidence in the case which tends to show that the respondent did incite, instigate, or persuade the witness Lowe to commit perjury, and this charge is not sustained. So much of specification one as charges the respondent with misconduct at the trial of said case is proved.

Upon the above findings under specifications one, four, and five, the judge found " that the respondent violated his oath of office as an attorney, and was guilty of deceit, malpractice, and gross mis- conduct in his said office " ; and entered judgment " that for these causes he be removed from the office of an attorney at law within this Commonwealth." The respondent appealed to this court.

The case was argued at the bar in March, 1896, and after- wards was submitted on briefs to all the judges.

*R. M. Morse*, for the respondent.

*E. Greenhood*, *pro se*, filed a brief.

*L. S. Dabney*, for the petitioner.

KNOWLTON, J. This is an appeal from a judgment of the Superior Court removing the respondent from the office of an attorney at law in the courts of the Commonwealth. The peti- tion for his removal alleges that he was admitted as an attorney by the Supreme Judical Court on January 20, 1885, and that he

" has ceased to be of good moral character, and has been guilty of deceit, malpractice, and other gross misconduct." Under this general charge there are specifications, of which the fourth, fifth, and so much of the first as charges the respondent with misconduct at the trial of the probate of the will of Howard Gill were found to be proved by the justice of the Superior Court who heard the petition.

Upon these findings the justice found that the respondent " was guilty of deceit, malpractice, and gross misconduct in his said office " of attorney, and entered judgment " that for these causes he be removed from the office of an attorney at law within this Commonwealth."

The proceedings were on the common law side of the court, and our jurisdiction is strictly defined by statutes. An appeal from the Superior Court to the Supreme Judicial Court in an action at law can be taken only from a judgment founded upon matter of law apparent on the record. Pub. Sts. c. 152, § 10; c. 150, § 7. In such an appeal the case cannot be transferred, but only the questions of law involved. These questions alone, and the necessary papers relating thereto, are entered in the law docket of the Supreme Judicial Court. Pub. Sts. c. 153, § 15; c. 152, § 12. *Commonwealth* v. *Scott,* 123 Mass. 418. In this case the only question of law apparent on the record is whether the general finding of " Guilty of deceit, malpractice, and gross misconduct in his said office," could legally be made on the pleadings and the elementary facts and findings set out in the record. This general question may be divided into two parts; first, whether the elementary findings and the general finding could properly be made upon the charges and specifications which were before the court without other charges and specifications; and secondly, whether the general finding of guilty was in substance warranted by the facts which appear on the record.

The Pub. Sts. c. 159, § 39, contain the following provision: " An attorney may be removed by the Supreme Judicial Court or Superior Court for any deceit, malpractice, or other gross misconduct, and shall always be liable in damages to the party injured thereby, and to such other punishment as may be provided by law." This provision is in accord with the general doctrine of the common law, under which courts have always

deemed it a part of their duty to remove from his office any attorney who in character and conduct has ceased to be a person proper to be held out by the court to the public as trustworthy. If, as it seems probable, the provision was intended to cover only deceit or misconduct in the performance of his official duties, it does not limit the power of the court at common law to remove an attorney from his office, either permanently or temporarily, for crime or other gross misconduct not connected with any official act. It has been held in other jurisdictions that similar statutes do not take away the jurisdiction at common law to remove an attorney for causes not included in the statute, such as ceasing to be of good moral character within the meaning of these words as used in a statute prescribing the requirements for admission to the bar. *Delano's case*, 58 N. H. 5. *State* v. *McClaugherty*, 33 W. Va. 250. *Sanborn* v. *Kimball*, 64 Maine, 140. *Ex parte Wall*, 107 U. S. 265. *In re O——*, 73 Wis. 602, and cases cited. *In re Percy*, 36 N. Y. 651. *Serfass's case*, 116 Penn. St. 455. *In re Mills*, 1 Mich. 392. We are of opinion that under this statute, as well as at common law, the removal may be absolute, leaving the party to apply to the court for readmission if his offence was of such a kind that, after a lapse of time, he can satisfy the court that he has become trustworthy; or for a stated time if the court is of opinion that the interests of the public will thereby be sufficiently protected. See *In re Hill*, L. R. 3 Q. B. 543; *In re Blake*, 3 El. & El. 34.

The first objection to the findings in this case is that they do not exactly conform to the specifications under which they are made. It is true that not all of the matters charged in these specifications are proved, and that some fundamental facts, previously charged, to which these specifications refer, are not exactly as alleged. If this were a criminal prosecution, the respondent might be entitled to a verdict of " Not guilty by reason of variance." But it is not a criminal proceeding. Its primary purpose is not punishment, but the preservation of the purity of the courts and the protection of the public from attorneys who disregard their oath of office. *Randall, petitioner*, 11 Allen, 473. *Ex parte Secombe*, 19 How. 9. *Randall* v. *Brigham*, 7 Wall. 523. *Ex parte Wall*, 107 U. S. 265. *Ex parte Brounsall*, Cowp. 829.

As was said in *Randall, petitioner, ubi supra*, in reference to procedure at common law, "No complaint, indictment, or information was ever necessary as the foundation of such proceedings. . . . No formal or technical description of the act complained of is deemed requisite to the validity of such a proceeding." It is enough if in some proper way the attorney is reasonably and definitely informed of the matters alleged against him, and given an opportunity of being heard in answer to them. See also cases cited *supra*. In the present case it sufficiently appears that the matters relied on by the petitioner were made known in the charges and specifications, even though they were not stated accurately, and it is evident that the facts and evidence bearing upon the conduct in question were as fully presented on both sides as the parties chose to present them. If there had been objection on the ground of a variance, the specifications might have been amended. The general charge was in proper form, and it is immaterial that the specifications were not proved exactly as alleged.

We now come to the question whether the particular facts found were sufficient to warrant a general finding of guilty of deceit, malpractice, and gross misconduct in office. The respondent, in resisting the probate of a will, called as a witness Florence W. Lowe, who had entered into an agreement in writing with his clients to aid them to the utmost of her power in the contest against the allowance of the will. Two other persons entered into the same agreement, and the pay of all of them was made contingent on the success of his clients in the litigation. If they succeeded, she was to have five hundred dollars and the other two were to have one seventh of the net amount obtained by the contestants; if they failed she and her associates were to receive nothing. She had lived in the family of the testator for a considerable time before his death, and was a material witness upon the subject of his mental condition. The respondent drew this agreement, and signed it in behalf of his clients. In pursuance of the agreement Florence W. Lowe interviewed witnesses, and aided in procuring evidence, and testified at the trial. The temptation held out by this arrangement, and the danger that it would lead to a trial in part upon untrustworthy testimony, bring it perilously near, if not within the

rule that forbids the making of similar agreements on grounds of public policy. *Patterson* v. *Donner*, 48 Cal. 369. *Marshall* v. *Baltimore & Ohio Railroad*, 16 How. 314. *Dawkins* v. *Gill*, 10 Ala. 206. *Gillett* v. *Logan County*, 67 Ill. 256. The respondent, although he had a duplicate of the agreement in his possession, did not make known its existence, produced Florence W. Lowe as a witness without disclosing that she had an interest of this kind, and when the existence of the paper was finally shown, on cross-examination, and when the presiding justice requested that the paper be produced by the witness, and it was understood that she would produce it, he excused her from further attendance, or sent her away, and told her " that when he wanted her again he would send for her." This was on May 25. On May 29, the witness not having returned, and the court having called for her and called upon him for an explanation, he said that he had a duplicate original among his papers in court, and he then searched for it, but did not find it. The paper was not exhibited until on May 31 the witness returned to the court and produced it. We think the finding of the court, that he tried to suppress this evidence, was well warranted. Whatever may be thought of his conduct up to the time when the existence of the paper was disclosed in cross-examination and the paper was called for by the judge, it was clearly his duty then, if not to do what he could to obtain and present the evidence, at least to do nothing to conceal or suppress it. He had taken an official oath to " do no falsehood, nor consent to the doing of any in court," and to conduct himself " with all good fidelity as well to the courts " as to his clients. Pub. Sts. c. 159, § 36. Fidelity to the court required him, when he had in his possession an important paper which the court called for to be put in evidence, to produce it. Instead of producing it, he waited four days without disclosing that he had any connection with it, and it was two days more, after a formal order from the judge, before the paper was obtained from his witness, who, in the mean time, had been staying away under his direction.

The question before us on this branch of the case is, not whether these facts necessarily show deceit, malpractice, or other gross misconduct, but whether they furnish any evidence of it from which the court could find it by way of inference

or otherwise. With reference to the question with what purpose and intent he was acting, it is to be remembered that much importance is to be attached to evidence which was before the trial court that cannot be put upon paper. Not only were other witnesses personally present before the court, but the respondent himself was a witness whose look and manner in giving his testimony may have been even more significant upon this question than his words. There is nothing upon the record to indicate that there was any error of law on the part of the court in making the original finding of guilty on this branch of the case.

In regard to the fourth and fifth specifications, it appears that when Rich filed his first account the respondent knew that he had failed to charge himself with as much by about nine hundred dollars for the stock as he ought to have done. He did not act in the interest of his clients at this time by objecting to the account and having the error corrected. So far as appears, he did not disclose his knowledge to anybody. Rich owed him a sum of money which he declined to pay unless the respondent would assent to the allowance of the account in behalf of his clients. The respondent, therefore, signed his assent in their names, obtained his pay, and the account was allowed. His signing tended to mislead the judge of the Probate Court and all who were to share in the balance in the hands of the executor. He testified that when he signed his assent he intended to wait until the second account was presented, and then to object to the allowance of that unless the executor would correct, to the extent of the interest of his clients, the first account which had been allowed with his assent, given for his personal advantage in such a way as to deceive the executor, the judge of the Probate Court, and the persons interested in the proceeds of the estate, including, so far as appears, his own clients. Thereupon, on the filing of the second account, he wrote a letter to the executor's counsel threatening the executor with an attack unless he paid the amount which his clients should receive, and proposing to keep the whole matter a secret if a payment was made. His conduct in reference to Rich, in giving his assent to the account and thereby obtaining his pay, and professing to make a written assent of his clients that would be valid and

effectual, when all the time he had a secret intention to avoid the assent on the filing of the second account, was dishonest. In reference to his clients, it is not to be inferred that they consented to his signing their assent to the allowance of an account which he knew gave them much less than they were entitled to, on the chance of subsequently getting the account opened to correct the error. His testimony that it was his intention when Rich should file his second account to object to the allowance of it "if his clients would authorize him so to do," plainly implies that he signed their assent without telling them of the error or conferring with them about the action to be taken in regard to it. His own interest to get his pay, which was the inducement to him to sign this assent, coupled with his threatening letter and proposal of secrecy after the second account was filed, warranted the judge of the Superior Court in inferring that in this he was wanting in fidelity to his clients, as well as to the court. To represent that his clients assented to the account under these circumstances was a direct fraud upon the Probate Court. His subsequent attempt to obtain what belonged to them, not by having the account corrected, but in an indirect way, does not relieve his conduct of its deceit and impropriety. We do not intimate that an attorney may not settle a claim in behalf of his clients, without stopping to see that justice is done to others who may have a similar claim, and without always disclosing irregularities of which he has knowledge, and for which he is not responsible. But what the respondent did was much more than this. The facts found, with the inferences that may be drawn from them, well warrant a finding that he was guilty of deceit and gross misconduct in his office of attorney, and it is immaterial that, in making his findings of fact, the judge has not attempted to make a complete analysis of the conduct described, nor to state all the particulars in which it was culpable.

It is important that the oath of office taken by attorneys on admission to the bar should not be considered and treated by those who take it as an empty form. Nothing in the life of the people more deeply concerns their welfare than the administration of justice in our courts. The high standard of integrity which is prescribed by our Constitution and our laws for the officers of our courts should be maintained. The removal or

suspension of an attorney is necessarily damaging to him, and may even be ruinous. It should only be ordered after a careful investigation of the alleged causes for it. But when it appears that one has ceased to regard the principles of morality, and that fidelity to truth and justice without which the practice of law is mockery, a court should not hesitate to remove him.

The question whether the interests of the public require a judgment of absolute removal, or of removal only for a time, is not before us. Like the imposition of a sentence on conviction of a crime, it involves a consideration of questions of fact, and is to be determined by the trial court in the exercise of its discretion.                    *Judgment affirmed.*

The Chief Justice and Justices Holmes and Morton do not agree with the decision upon the fourth and fifth specifications. In their opinion the report of the judge shows that his judgment upon them went upon a finding that the charges of those specifications were true as alleged, and was not reached from the point of view taken by the decision, which avowedly differs from that of the specifications. They are apprehensive that the decision of the Superior Court on these specifications was founded upon a questionable conception of a lawyer's duty, and now is supported upon grounds which have not been considered or passed upon by the Superior Court.