In re SIMON HAHN, a solicitor of the court of chancery of New Jersey.

[Argued November 16th, 1915.]

1. One deprived by order of the court of chancery of his office of solicitor and of the right of exercising to the full extent the office of counselor is aggrieved thereby within *1 Comp. Stat. 1910 p. 450 § 111*, authorizing persons aggrieved by any order of the court of chancery to appeal from the same.

2. Under *2 Comp. Stat. 1910 p. 2278*, fixing a fee for the governor for a license to an attorney and solicitor, to appear and practice in all courts, and page 2281, providing for fees for the judges of the supreme court for license to an attorney and solicitor, and page 4054, section 5, providing that any counselor, solicitor or attorney who shall be guilty of malpractice in any of the courts shall be put out of the roll and not thereafter permitted to practice, unless he shall obtain a new license

and be again enrolled in due form of law, which is section 5 of the Practice act of 1903, regulating "the practice of courts of law," and the constitution, protecting the jurisdiction of the court of chancery as existing at the time of the adoption of the constitution, the court of chancery has no jurisdiction to make an order adjudging a solicitor guilty of malpractice and debarring him from practice as solicitor and counselor in the court of chancery.

3. An order of the court of chancery debarring a solicitor in chancery from practicing as solicitor and counselor in the court of chancery cannot be sustained under the Practice act, requiring the solicitor to act under the direction of the court, which refers only to causes in which the solicitor is acting, and not to his own disqualification for practicing.

4. An order of the court of chancery disbarring a solicitor in chancery from practicing as solicitor and counselor in the court of chancery, entered in proceedings not purporting to be proceedings to punish for contempt, is not sustainable as a punishment for contempt.

5. Whether an order of the court of chancery, disbarring a solicitor in chancery from practicing as solicitor and counselor in the court of chancery, is sustainable as an order suspending him from practicing in the court of chancery until the supreme court has acted under the statute, will not be considered on a motion to dismiss an appeal from the order, but the question can be dealt with only on the appeal itself in determining whether the order shall be affirmed, reversed or modified.

On appeal from an order of the court of chancery made by the chancellor, whose opinion is reported in *84 N. J. Eq. 523.*

The order appealed from is entitled as above. By its terms it required the appellant to show cause why he should not be adjudged guilty of malpractice as a solicitor or counselor, or be suspended from practice as such or otherwise disciplined and punished for his misconduct, as might be decreed equitable and just. The court of chancery adjudged that he was guilty of malpractice and that for his gross misbehavior in his office of solicitor in chancery, he should be debarred from practice as solicitor and counselor therein. From this order the solicitor appealed. The motion is to dismiss the appeal.

*Mr. Nelson B. Gaskill,* for the motion.

*Mr. Robert H. McCarter (Mr. George W. C. McCarter* with him), opposed.

The opinion of the court was delivered by.

SWAYZE, J.

The proceedings are not in the nature of proceedings for contempt of court nor mere disciplinary proceedings. The distinction between proceedings to punish for contempt and proceedings to disbar is sufficiently shown by the decision of the United States supreme court in *Ex parte Bradley, 7 Wall. 364,* and *Ex parte Robinson, 19 Wall. 505.* We have no doubt that the chancellor has the same power to proceed against an attorney for contempt as against any other person, and that he has the additional power to suspend a solicitor or counselor from appearing in the court of chancery provided he does not go as far as to infringe upon the powers possessed by the supreme court at the time of the adoption of the constitution of 1844. This would include power to suspend until the facts could be presented to the supreme court for more severe action. Whether an appeal will lie from an order punishing for contempt or even suspending a solicitor for a limited time as an act of mere discipline is not the question now before us. This order "debars" Mr. Hahn from appearing hereafter in the court of chancery as a solicitor or counselor, and prohibits him from exercising any of the functions, rights or privileges of a solicitor or counselor of that court. We do not know whether the selection of the unusual word "debar" was merely accidental, or whether it was chosen advisedly in an effort to distinguish the order from the well known, and long-continued procedure of the supreme court not hitherto departed from in the whole history of New Jersey's jurisprudence, except perhaps in a single sporadic case to be mentioned hereafter. That procedure was commonly known as a procedure to disbar. As neither "disbar" nor "debar" accurately expresses the result in technical terms, the mere question of words is not important. Nor do we attribute any significance to the fact that the proceeding was by its title directed against Mr. Hahn as a solicitor only, and was for malpractice as a solicitor while the order affects him as a counselor also. The fact that he is prohibited from exercising his rights as a "coun-

selor of this court" is, as will be shown, of more importance. We deal with the substance rather than the form of the order. In substance it has the same effect, if valid, as far as the court of chancery is concerned, as striking the appellant's name off the roll would have, and the real question now before us is whether an appeal will lie from an order of the court of chancery having that effect.

There is some divergence in the cases as to whether an appeal will lie in such a case where the lower court has jurisdiction. It turns sometimes upon a mere question of procedure, and sometimes upon the statutes of the state. Our statute, dating from 1799 (*Pat. L. p. 434 § 59*), enacts that all persons aggrieved by any order or decree of the court of chancery may appeal from the same or any part thereof to the court of errors and appeals. *Comp. Stat. p. 450 § 111.* On the face of it, we think that a man is aggrieved by an order that deprives him of one office, that of solicitor, and prevents him from exercising to the full extent, another office, that of counselor. We need not go so far as the supreme court of Connecticut and hold that the office of solicitor or counselor can fairly be regarded as property. *In re O'Brien's Petition, 63 Atl. Rep. 777, 780.* It is enough to say that one holding such an office is as much aggrieved and entitled to appeal to the courts for protection in its enjoyment, as a public officer or the officer of a private corporation is by means of *quo warranto, mandamus* or *certiorari* with an ultimate appeal to this court. The right of appeal by attorneys from orders of disbarment is well settled by the decision of tribunals of the first authority. In *Ex parte Bradley, 7 Wall. 364,* a *mandamus* was issued to restore an attorney and counselor to his office from which he had been removed by an inferior tribunal. Mr. Justice Miller dissented from this judgment of the court but did not question that a state appellate tribunal might entertain an appeal; his argument was that the supreme court of the United States possessed no such general supervisory power over inferior federal courts as belongs to the king's bench and the appellate tribunals of the states. The jurisdiction of the last named tribunals to

33

review has been exercised in repeated instances. It is enough to cite *In re Durant, 80 Conn. 140; Matter of Eldridge, 82 N. Y. 161*. The report of the former case in *10 Ann. Cas. 539* is accompanied by a note citing cases in which the appellate jurisdiction has been exercised; in some the facts have been reviewed, and in others the legal errors only. *Bar Association* v. *Greenhood, 168 Mass. 169; 46 N. E. Rep. 568*. In the last cited case, the language of the statute was similar to that of our Chancery act above quoted. In England, also, an appeal is allowed from an order striking a solicitor off the roll, *In re Hardwick, L. R. 12 Q. B. D. 148; 53 L. J. Q. B. 64*.

Whatever doubt there may be as to the right of appeal from a mere disciplinary order, there can be no doubt as to the appealability of such an order as this if the court of chancery was without jurisdiction to make it, since if this court cannot restrain the excess of jurisdiction, no court can, and the usurpation of power, if there is any, would go uncorrected. The supreme court could not act by *mandamus* as the United States supreme court acted in the Bradley case, because the court of chancery is one of co-ordinate jurisdiction. Only this court can act, and that by way of appeal. The stress of the argument at bar was upon the question whether the court of chancery had jurisdiction. This question we proceed to consider.

Our method of licensing counselors, attorneys and solicitors is peculiar. From the very beginning of the Province of New Jersey in the time of Lord Cornbury and probably in East Jersey at least from the time of Governor Basse in 1698 (*Leam. & Spen. 223 § 11*), attorneys and counselors have been licensed by the governor under the great seal of the state. The supreme court never has licensed them nor admitted them to practice. *In re Branch, 70 N. J. Law 568, 570, 571*. There has never been a suggestion that the court of chancery has licensed solicitors to practice in that court. A careful distinction has been preserved in that court between masters and solicitors. Beginning with 1817 at least, the rules of the court of chancery have provided for the oaths of masters but not for the oaths of solicitors, no doubt because solicitors who were licensed by the governor, were

sworn in the supreme court, and there were no solicitors licensed by the chancellor as chancellor. After the new constitution of 1844, there seems to have been some doubt of the power of the chancellor to appoint masters, and in 1845, the legislature enacted that the power should continue in the chancellor. *P. L. 1845 p. 161.* This was confirmed in 1846. *P. L. 1846 p. 188.* The act now appears in the compiled statutes. *Comp. Stat. 3785 pl. 8.* There is no such legislation as to solicitors. A claim by the chancellor to appoint or remove solicitors is inconsistent with the language of the governor's commission. See *70 N. J. Law 570.* The mandate of the governor under the great seal, attested by the secretary of state, is addressed to the court of chancery as well as to the supreme court and all the courts of record within the state. In 1748 the colonial legislature enacted a fee bill (*1 Nevill 338; Allinson 160*) which gave the governor a fee of twenty shillings for licensing an attorney, and the supreme court a fee of eighteen shillings for "admitting" every attorney, and those provisions, in substance, have remained on the statute books. No mention was made of any license to a solicitor until the act of 1799 (*Pat. L. p. 418*) which gives the governor a fee of three dollars for a "license to an attorney and solicitor," and the judges of the supreme court a like fee in the same language. The language is repeated in the revision of 1877 and is to be found in the compiled statutes of 1910. *Comp. Stat. pp. 2278, 2281.* The fact that attorney and solicitor were coupled, that a fee was allowed the governor, and a like fee for the same service to the justices of the supreme court, is significant enough; its importance is emphasized by the fact that although the chancellor was then paid by fees and his fee bill was for the first time, as far as appears, provided for by the very same act of 1799, no mention is made of any fee to him for licensing a solicitor. Governor Paterson had himself been governor and chancellor, and was not likely to overlook any of the chancellor's rights when he was for the first time drawing a fee bill to be provided for that officer by the legislature. It is probable, as suggested in the case of *Raisch, 83 N. J. Eq. 82,* that in New Jersey as

in England in early times, no distinction was made between the practice of an attorney in a court of law and his practice in the court of chancery. The instances cited by the learned vice-chancellor on pages 114 and 115 point to that. But when Judge Paterson was drawing the fee bill and the Practice act, he wrote with accuracy, and for the first time a fee was provided the governor for a license to an attorney. and solicitor. The license was as it has ever since been a single license to one individual in a double capacity for one fee. See *Lynde* v. *Lynde, 64 N. J. Eq. 736, 747.* That the governor in granting the license was acting as governor and not as chancellor also is apparent from the fact that the fee was given him as governor, and not as chancellor; while the fee for such judicial service as was rendered even in the licensing of a solicitor was given to the justices of the supreme court.

Enough has been said to demonstrate the difference between our practice and the English practice. Practitioners in the superior courts in England were admitted by each several court to practice in that court, and each court had its own roll. *3 Bl. Com. 26.* By the act of *2 Geo. II. c. 23 § 20,* a sworn attorney in any of the courts of king's bench, common pleas, &c., might be sworn and enrolled as a solicitor without further fee after an examination of his qualifications to be a solicitor. That act did not give a similar privilege to solicitors to act in the law courts, and the omission was corrected by *23 Geo. II. c. 26, § 15,* which permitted solicitors to be enrolled as attorneys of the king's bench or common pleas without fee upon an examination by the judges of the solicitor touching his fitness and capacity to act as attorney. Under such a system, each court controlled its own roll and its own officers, and although an attorney who had been struck off the roll of one court might also be stricken off the roll of another court, this was not always done. *1 Tidd 89; 1 Arch. 30; In re Richard Peter Smith, 1 B. & B. 522.* The power of the English courts was a power to discipline officers of their own appointment by striking names off a roll kept by that very court, not by some other. In New Jersey the appointment comes not from the court but from the governor; counselors, attorneys and solicitors are more than

mere court officers; their commissions run in substantially the same terms and are issued by the same authority and with the same solemnity as our own. They do not in terms require enrollment by the court. That requirement comes from immemorial usage descended from the English practice and implied rather than required by the Practice act. But for the provisions of that act it might be doubtful whether even the supreme court could nullify the governor's commission, or whether any action of that character could be of consequence if the governor should choose to issue a new commission. Could the chancellor, even if he knew an attorney and solicitor to be unfit to practice, refuse to obey the mandate of the governor? Whatever the inherent power of a court may be to punish its officers, it has no inherent power to deprive the governor's commission of its efficacy to authorize an attorney and solicitor to "appear and practice in all courts of record and to receive fees therefor, and to require all judges, justices and others concerned to admit him accordingly." The power of the supreme court to deprive the governor's commission of its efficacy rests on the Practice act of 1799. Section 3 of that act which appears substantially unchanged in the Revised Practice act of 1903 (*Comp. Stat. p. 4054*), enacted that if any counselor, solicitor or attorney-at-law shall be guilty of malpractice in any of the said courts, he shall be put out of the roll and never after be permitted to act or practice as a counselor, solicitor or attorney-at-law, unless he shall obtain a new license and be again enrolled in due form of law. The section is directed against malpractice in "any of the said courts." The reference is to section 1 of the act, which authorizes every person of full age and sound memory to prosecute or defend any action in any of the courts of judicature of this state in person or by his solicitor in chancery or attorney-at-law. The reference to "solicitor in chancery" makes it clear that the court of chancery was included among the courts, for malpractice in which an attorney and solicitor could be put out of the roll. The collocation of sections remained the same until the revision of March 27th, 1874; section 3 became section 5, and the language was changed so as to read, "If any counselor, solicitor or at-

torney-at-law shall be guilty of malpractice in any of the courts, he shall be put out of the roll." The words "any of the courts" are as broad as they can well be and the use of the word "solicitor" again shows that the court of chancery was included. So also does the language of section 5 of the revision of 1903, "any court." Although the title of the Practice act points only to the courts of law, it must be remembered that our constitutional provision as to the title of an act is not found in the constitution of 1776, and the act of 1799 was therefore not objectionable on that score. In 1844, when our present constitution was adopted, the power of the supreme court under the act of 1799 was settled beyond the power of legislative interference; and the legislature in the revisions of 1846, 1877 and 1903, merely followed the ancient lines.

Judge Paterson prepared also an act respecting the court of chancery which was passed in 1799, a few months after the Practice act. *Pat. L. p. 428.* He made no provision therein for the punishment of solicitors who had been guilty of malpractice. It is almost inconceivable that he would have omitted such a provision in the Chancery act and inserted it in the Practice act if it had been meant that the court of chancery should possess that power. Moreover the language of the Practice act demonstrates that the power was meant to be limited to the supreme court. The only penalty prescribed for misconduct, including as we have said, misconduct in any court, was that the delinquent solicitor should be put out of the roll, and never after permitted to practice. Obviously before he could be put out of the roll, he must be on it. The only roll ever known in New Jersey is a roll kept by the clerk of the supreme court, going back to colonial days, and for many years the oath to which an attorney and solicitor subscribed on that roll, has covered his office both as solicitor and as attorney. *In re Raisch, 83 N. J. Eq. 97.* The oath has always been taken before the supreme court. The suggestion in the *Raisch Case* that Judge Paterson, when he drew the Practice act of 1799, either erroneously supposed that the court of chancery maintained a separate roll of its solicitors and that they took their official oath as solicitors before the chancellor in open court, or assumed

that this practice (the English practice) would be established forthwith in New Jersey, can hardly be taken seriously. That Judge Paterson, who was a solicitor himself and had already served as chancellor, could have made the mistake of supposing that he had signed such a roll as solicitor, or that he had had such a roll in his custody as chancellor, when in fact he had not, and that he had taken an oath as solicitor before the then chancellor or that others had taken such an official oath before him when chancellor, in open court, when the fact was otherwise, is to us incredible. The alternative supposition that the English practice would be forthwith established in New Jersey is an impossible supposition since Judge Paterson himself omitted from the Chancery act all provision as to striking solicitors from the roll and carefully inserted such a provision in the Practice act. The language is struck out of the *roll*, not the *rolls*.

Judge Paterson moreover had a good reason for putting the provision in question in the Practice act. Although the commissions of counselors, attorneys and solicitors were from the governor under the great seal of the state, the practice was to issue the commission on the recommendation of the supreme court, and only on that recommendation. Even the commission to one as solicitor was issued on the recommendation of the supreme court, as soon at least as the commission began to run to the licensee as both attorney and solicitor. It was because the justices of the supreme court did the work that the legislature gave them the fee, making no distinction between attorney and solicitor and giving one fee for the two combined. There was another and a more cogent reason. The evil of the English practice was that a man might be able to practice in one court who had been stricken off the roll of another court. That evil was the natural, almost inevitable result, of each court having a separate roll. That evil Judge Paterson guarded against by providing that for malpractice in any court, the practitioner should be put out of the roll and never after permitted to practice as counselor, solicitor or attorney, unless he obtained a new license and was again enrolled in due form. The evil of having solicitors and attorneys under the control of two distinct courts is well illustrated in the present case. Mr. Hahn's offence is said

to have been committed by him as a solicitor in his practice in the court of chancery. The supreme court would have no means of knowing the facts unless communicated to it by the chancellor, as in the *Cahill Case,* hereinafter referred to, or by some outside agency. The chancellor, by proceeding to "debar" the solicitor, prevents him from practicing in the court of chancery before the supreme court can even direct proceedings to be begun in the supreme court. Under our constitutional provisions, the attorney cannot be put out of the roll without notice and a hearing, and pending the hearing, if the present order is valid, the lawyer, as he is commonly called, may practice in one tribunal and not in another, the very scandal that Judge Paterson's act would have avoided. One who is put out of the roll of the supreme court is disqualified to practice in all courts; one who is "debarred" as solicitor may still practice in all other courts unless a new proceeding is had against him. Judge Paterson could not have meant that. Again, the provision as to putting counselors out of the roll is contained in the same section as the provision relating to attorneys and solicitors. Whether the attorney and solicitor holds two offices, as the vice-chancellor argues in the *Raisch Case,* or is one officer with two distinct functions as a justice of the supreme court is also a judge of the oyer and terminer, is unimportant; a counselor certainly holds but one office, that of counselor-at-law. There is no such officer as "a counselor of this court," to use the words of the chancellor's order. The office of counselor-at-law cannot be divided by the action of the court of chancery; the governor's commission requiring all courts to admit him as such cannot be deprived of its efficacy in one end of the state house while it remains efficacious in the other. So far as the present order affects Mr. Hahn as counselor, it is a clear excess of jurisdiction. It is notable that in the case of Cosey, argued at the same time, there was no attempt to "debar" him from practice as counselor; so, that if the order in his case is valid, although he may not issue a subpœna, he may, nevertheless, appear and argue before the chancellor as a counselor.

To return to the language of the Practice act of 1799. The provision as to re-enrollment of itself is conclusive against the

jurisdiction of the court of chancery. A new license could be obtained only as the old license had been obtained, by a recommendation of the supreme court and a commission from the governor; and that commission would require the chancellor as well as other judges to admit the practitioner to practice. The control of this new license and re-enrollment would thus be in the supreme court, and the man who had been "debarred" on one day by the chancellor might walk into court with the governor's new commission the next week. To avoid that scandal the control was put in a single tribunal, the supreme court. No doubt our whole system of admission to the bar and of disbarment is *sui generis,* but it has worked well, and, so far as we know, without difficulty for over a century, recognized by the court of chancery as well as by the supreme court, and no question has ever been brought to this court until the present time. We are far from suggesting that any inherent power of the court of chancery is lost by disuse; but when the question is whether the power existed in that court, the fact that it has not been exercised, is a cogent argument against its existence. The argument becomes irresistible when we find that a distinguished chancellor communicated to the supreme court a case of malpractice by a solicitor in the court of chancery "with the suggestion that it was a case for discipline." *In re John Francis Cahill, 66 N. J. Law 527.* It is true we are referred in the opinion of the vice-chancellor, in the *Raisch Case, 83 N. J. Eq.* (at *p. 111*), to an unreported case, *In re Edmunds,* where Chancellor Runyon, it is said, expelled from office a solicitor who had forged a decree of divorce. The fact that no opinion is reported, and that the chancellor "stayed the infliction of the penalty," weakens the value of the case as a precedent even in the court of chancery. We cannot avoid the thought that perhaps he came to entertain doubts of his jurisdiction. The explanation that he was led by considerations of mercy seems hardly adequate in view of the serious nature of the offence—one in which mercy would be misplaced. Such weight as the case might have had in the court of chancery is lost in the face of the subsequent action of Chancellor Magie in the *Cahill Case,* and it was never followed until two years ago in the *Raisch Case.* Even the

opinion in that case is of no more value as a precedent than the weight, great, to be sure, to be given to the view of the very learned and able judge who gave expression to it. Confessedly, what he said was merely *obiter*, since the question of jurisdiction was not raised in the case (see pages 85, 86), and the discussion of that subject, it seems probable, was intended as a foundation for a claim of jurisdiction in the court of chancery that had never been exercised before, with the possible exception of the *Edmunds Case.* This court is not bound by the *Raisch Case,* nor by the cases in the court of chancery that have followed it during the last two years without any further consideration of the question of jurisdiction.

We have thus far dealt with the question as one of statutory construction. The *Raisch Case* seeks, however, to vindicate the jurisdiction, on the theory that the power was inherent in the court of chancery when the constitution of 1844 was adopted. This is deduced from the fact that the English chancellor exercised the power over the solicitors in his court. The deduction lacks support in fact. What the English chancellor did was to strike off the roll of the court of chancery a solicitor who was enrolled thereon. Precedents antedating the Judicature acts of 1873 and 1875 are given in *Seton Dec. 651, 652.* There is nothing that we have found or that counsel has cited to show that the English chancellor ever undertook to strike a name off the roll of the king's bench. The very reason that the order now brought here for review rejects the precedents of the English chancery and "debars" Mr. Hahn is that the established form of order would be absurd since Mr. Hahn has never signed a roll of the court of chancery. A novel term had to be invented for this novel proceeding and he is "debarred." No power to "debar" was ever asserted by the English chancery.

But the case is of too much importance to rest the argument upon the novelty of the word used, significant as that novelty is. The jurisdiction of the court of chancery that is protected by the constitution of 1844, is the jurisdiction that existed at that time. This jurisdiction was not necessarily the same as the jurisdiction of English chancery. So far as the latter depended on English

statutes antedating the Revolution, our inquiry must be whether the statute was in force in New Jersey. The regulation of the enrollment, which meant the admission to practice, of solicitors was regulated at the time of our Revolution by statutes. The name "solicitors" seems to have arisen in the seventeenth century. *Chris. His. Sol. 74.* In 1729, the act of *2 Geo. II. c. 23,* for the better regulation of attorneys and solicitors was passed. That act required only an oath that the affiant would truly and honestly demean himself in the practice of an attorney. *Chris. 111.* We have already referred to the act at length. It was extended (*23 Geo. II. c. 26*) so as to give solicitors the privilege to practice in the king's bench without further fee. The important point is that the practice of solicitors was regulated by statute. By the constitution of 1776 it was provided that so much of the statute law as had theretofore been practiced in the colony, should still remain in force, until altered by the legislature. To make definite exactly what was meant, the legislature, on November 24th, 1792, authorized Judge Paterson, who was then governor, to collect and reduce into proper form all the statutes of England or Great Britain, which before the Revolution were practiced and which by the constitution extended to this state, as also all the public acts passed by the legislature before or since the Revolution which remained in force; and, on March 19th, 1795, authorized him to collect, alter and modify the statutes he had not reported on and to propose to the legislature such bills as to him should appear conducive to the general interests of the state and to the completion of the revision and system of the laws of this state. Judge Paterson's work, in pursuance of these legislative mandates, has ever since been treated as a complete system of the statute law of New Jersey, in 1799. *Schomp* v. *Schenck, 40 N. J. Law 195.* The omission of the acts of *2 Geo. II. c. 23,* and of *23 Geo. II. c. 26,* together with the enactment of the Practice act of 1799, make it clear that the English law as to the admission of solicitors was not applicable in this state, and account for the uniform practice with reference to the matter. We find no jurisdiction of such proceedings as this existing in the court of chancery when the constitution of 1844 was adopted.

The order cannot be sustained under the section of the Practice act requiring the solicitor to act under the direction of the court. That, obviously, refers to causes in which he is acting, not to his own disqualification for practicing at all, which is the subject of another clause of the statute. It is, however, suggested that the order made by the chancellor may be sustainable as a punishment for contempt. This amounts to saying that what the court of chancery cannot do directly, it can do indirectly. The distinction between the power to punish for contempt, and the power to disbar, is pointed out in *Ex parte Robinson, 19 Wall. 505,* and the care our own courts take to avoid excessive punishment for contempt, is apparent from our opinion in *O'Rourke v. Cleveland, 49 N. J. Eq. 577.* As far as we know, the power to punish for contempt is limited to fine and imprisonment and does not extend to stripping a man of his means of gaining a living. We need not pursue the subject, since the proceedings do not purport to be proceedings to punish for contempt and there is no adjudication of a contempt.

As the court of chancery was without jurisdiction to make the order, the motion to dismiss the appeal must be denied.

The question whether or not the order debarring the appellant may be held to be an order suspending him from practicing in the court of chancery until the supreme court has acted under the statute is not presented by a motion to dismiss the appeal which is all that is now before us; such a question can be properly dealt with only upon the appeal itself, when the question will be whether the order brought up by the appeal shall be affirmed, reversed or modified.

TRENCHARD, J. (dissenting).

I am unable to concur in the conclusion of the majority of the court. I think the court of chancery had jurisdiction to make the order under review. I think it had power to make it substantially, for the reasons given by Vice-Chancellor Stevenson in his opinion *In re Raisch, 83 N. J. Eq. 111,* in which case an order quite like the one here was made. If, as I think, the court of chancery had power to make such order, it follows, upon well-settled principles, that it is not appealable. I vote to dismiss the appeal.

I am requested by Mr. Justices Garrison and Black, and Judges White, Terhune and Heppenheimer, to say that they concur in this view.