In the matter of ADDISON P. ROSENKRANS, a solicitor of the court of chancery of New Jersey.

[Decided April 30th, 1915.]

1. Mere delay in prosecuting a client's cause, unless, perhaps, it is so long continued as to be evidence of fraudulent conduct, does not afford the basis for disciplining a solicitor, beyond reprimand and an admonition to proceed; but when a solicitor receives a fee, especially when it is all he asks, upon a promise speedily to prosecute, and then does nothing whatever to that end—does not even start—but, on the contrary, when asked by his client for information as to the status of the cause, he falsely informs her that it is pending and is being prosecuted with all convenient speed—in whatever words the idea is conveyed—he is guilty of fraud upon his client, and for this he should be disciplined.

2. A solicitor who counsels and procures a client to make an affidavit "that she is the petitioner named in the foregoing petition," and, also, "that the matters and things therein set forth are true, to the best of her knowledge and belief," when, in fact, there is no petition in existence, with intent to annex the affidavit to a petition thereafter to be drawn and filed (which would have aggravated the matter, involving uttering a false affidavit and imposing the same upon the court), is guilty of professional misconduct amounting to malpractice.

3. Professional malpractice is of three kinds—ignorant, negligent and willful. While disciplinary proceedings may not be taken against a solicitor for ignorant malpractice, for negligent malpractice he can be censured by the court. and in gross cases disciplined; and, for willful malpractice, he can be disciplined even to the extent of disbarment.

4. The offence of the respondent is of a dual character (a) obtaining money from a client upon the promise of prompt professional service, without rendering any service, accompanied by false representations that her cause was being prosecuted with all convenient speed, extending over a period of seven months, and (b) counseling and procuring her to make an affidavit false in fact in the sense that the alleged fact did not exist but not false in that it was contrary to existing facts, with intent to make use of the affidavit. Both offences were deliberately, that is to say, willfully committed. These offences, singly or together, amount to malpractice in a solicitor, and for both of them suspension from practice for a period of two years is a proper penalty under all the facts and circumstances of the case at bar.

5. The violation of a promissory obligation followed up with the false assertion, oft repeated, that the promise was being performed, is malpractice, in a solicitor who has received a fee from a client for professional service.

On order to show cause why the respondent should not be disbarred or otherwise disciplined and punished.

*Mr. Nelson B. Gaskill,* for the prosecution.

*Mr. Clifford L. Newman,* for the respondent.

WALKER, CHANCELLOR.

Upon complaint of Mrs. Stella Van Dien accusing Addison P. Rosenkrans, a solicitor, with unprofessional conduct in not prosecuting, while he represented to her that he had commenced and was prosecuting in the court of chancery a proceeding to obtain for her maintenance for her child after a decree of divorce already made in her favor against her husband, which had been obtained by another solicitor, an order to show cause was made which recited substantially as follows: That he, Rosenkrans, was charged with malpractice as a solicitor of the court of chancery, in that he, being such solicitor, was consulted by Mrs. Van Dien for the purpose of obtaining his advice with respect to her proposed action for support of her child, who related to him the circumstances in which she found herself after the decree of divorce, as being without other means for her support than the income from her own labor, which was insufficient to maintain herself and her child, because of which it was necessary for her to take some steps to compel her former husband, Arthur G. Van Dien, to contribute to the support of the child, and to pay Mrs. Van Dien such sums in the nature of alimony as the court might award; whereupon he, Rosenkrans, agreed to undertake the cause for Mrs. Van Dien and received a retaining fee in the sum of $5, and thereafter failing in an attempt to obtain or enforce a voluntary agreement for alimony and support, he, Rosenkrans, requested Mrs. Van Dien to call at his office; that she did so on or about the 10th day of February, 1914, and was informed by him of the impossibility of obtaining an agreement for support and alimony; that it would be necessary to institute proceedings for that purpose, and that if she, Mrs. Van Dien, would give to him, Rosenkrans, the sum of $25 he would start the proceedings that afternoon and push the matter with all possible speed,

and that the cause would come up in Paterson in about two weeks time; that he would conduct the proceedings as cheaply as possible, do all he could in her behalf, and urged upon her that he would do all that was right in the premises; and Mrs. Van Dien not then being in possession of the sum of $25 required by Rosenkrans as preliminary to the institution of proceedings, was obliged to borrow and become indebted for that amount, and did so, and on the 17th day of February, 1914, paid Rosenkrans the sum and obtained therefor a receipt signed by him acknowledging the payment thereof for his services in procuring an order for alimony and support for her child, under the final decree in the action for divorce of Stella Van Dien against Arthur G. Van Dien already concluded; and that Rosenkrans, having received the $25, thereafter neglected and failed to institute any proceeding in behalf of Mrs. Van Dien against her former husband for alimony and support, filed no papers or proceedings in the court of chancery, and wholly neglected and failed to prosecute the cause which she had placed in his hands, and for which she had paid him the fee requested, and thereafter neglected and refused to inform her accurately and truthfully concerning the status of the matter and on several occasions made appointments with her, but postponed and failed to keep the same, or to advise her of the exact state of the proceedings; that in March, 1914, Rosenkrans wrote Mrs. Van Dien that he would be ready very shortly, but that matters of more immediate and pressing importance had delayed her cause; that, subsequently, Charles W. Vreeland, making inquiry of Rosenkrans, at the solicitation of Mrs. Van Dien, received a post card written and signed by Rosenkrans, dated the 10th day of April, 1914, stating that the taking of proofs in the Van Dien matter would be postponed until Saturday, the 18th, and on the 17th Rosenkrans again wrote Vreeland stating that as soon as he had the testimony in another matter he would fix a day to take proofs in the Van Dien case; that he, Rosenkrans, subsequently stated to Forrest Mackey, who visited him on behalf of Mrs. Van Dien, that the hearing in her cause would be held on Saturday, July 18th, 1914, but no hearing was in fact held at any time, nor was any petition or other proceeding filed by Rosenkrans in the

cause of Mrs. Van Dien; and that Rosenkrans was not, either at the time of the writing of the post cards to Vreeland or the statements to Mackey, in a position to take proofs or otherwise forward the cause as indicated by the post cards, or the statements to Mackey; and that Rosenkrans, although repeatedly urged by Mrs. Van Dien to proceed with her case, or reeturn to her the money which she paid to him as her solicitor in that behalf, neither instituted nor forwarded her cause, and had not returned to her the money so paid.

Nelson B. Gaskill, Esq., was assigned to prosecute the order to show cause, and the matter came on for hearing before me in his presence, and in the presence of the respondent himself, and of Clifford L. Newman, Esq., his counsel, Mrs. Van Dien, Forrest Mackey, John M. Weaver, Charles W. Vreeland and the respondent, Rosenkrans, were examined as witnesses. There was no dispute, at least, no material dispute, concerning the essential facts recited in the order to show cause and above set forth.

Mr. Rosenkrans, the solicitor, testifying in his own behalf, said that he was admitted to the bar of this state in June, 1907, and had practiced since that date; that Mrs. Van Dien's object in calling upon him was to learn whether or not there was an agreement in writing signed by her former husband in which he bound himself to pay her $3 a week toward the support of their child (no provision for maintenance having been made in the decree which she had obtained), and to learn whether, notwithstanding there was a divorce, she might institute proceedings of some sort by which she could oblige her husband to continue to make payments towards her child's support, her husband having paid $3 a week with more or less irregularity and being then in arrears; that he told her it was not too late to proceed in a supplemental way in her divorce case; that if she would send him $25 he would undertake the matter for her, she paying him $5 then for his advice and to cover his inquiries as to whether a written agreement was in existence.

Mrs. Van Dien paid a second visit to Rosenkrans and took him her decree *nisi* and final decree. Rosenkrans said that at this interview the affidavit was drawn and signed by Mrs. Van Dien. This was new matter—came as a surprise; the affidavit

was called for by me and produced by Rosenkrans. It was sworn to as well as subscribed. It was offered in evidence and will be adverted to later.

The interview between Mrs. Van Dien and Rosenkrans, at which the affidavit was made, occurred on February 10th, 1914. Asked why, after February 10th, a petition was not filed or some proceeding taken, Rosenkrans said that he had intended to get it all ready for the late afternoon of that day, after the close of the register's office, where he was making a search; that he intended getting an order of reference to some master in Paterson to take testimony on Mrs. Van Dien's application on the supplemental petition; that he expected to move before me for an order of reference *ex parte,* and as, of course, instead of giving notice to the defendant. Such an order he could not have obtained.

It is strange that Rosenkrans should have thought that a defendant against whom a final decree had passed without an award of alimony or maintenance in it could afterwards be visited with an order or decree for alimony without an opportunity to be heard.

On February 17th $25, which Mrs. Van Dien was obliged to borrow to the knowledge of Rosenkrans, and which he says was a final payment of what he asked, was paid to him, and yet up to the date of the order to show cause, September 16th, 1914, which was seven months afterwards, he had instituted no proceeding on his client's behalf.

On April 3d, 1914, Rosenkrans visited Mrs. Van Dien's home at Upper Macopin, New Jersey, being in that neighborhood to obtain witnesses in another cause, and, allusion being made to her matter, he said that he had not yet got ready to take care of it; that he had been very busy from the time he got the money until a certain homicide case, in which he was counsel, was disposed of, and had been very busy since, and said that he would take care of her case and might be able and ready to start by Saturday, April 17th, and had it in mind to go down to Trenton with a verified petition and get an order of reference to some master in chancery in Paterson who would hear the matter. He appears not to have known that he could have applied to any

vice-chancellor for an appropriate order to show cause upon the delinquent husband.

Vreeland and Mackey were interested in behalf of Mrs. Van Dien, and it was with them and not with her directly that Rosenkrans corresponded and talked about her matter.

On May 29th, 1914, Rosenkrans wrote Mackey as follows:

"In suggesting the 30th instant, in the Van Dien matter, I hit upon Decoration day, which neither Mr. Vreeland nor I then thought of as a holiday. We can take care of the matter almost any day next week; but on account of the sittings of the Circuit Court and the uncertainty as to the list of causes, I think that we had better fix upon next Saturday, when every one concerned will be free.

"If that date is satisfactory to your people, it will be satisfactory to me."

And on April 10th he wrote Vreeland as follows:

"We will postpone taking of proofs in the Van Dien matter till Saturday the 18th.

"Will explain occasion for postponement, when I see you."

And on April 17th he again wrote Vreeland as follows:

"As soon as I have testimony in the Sisco case, I will fix a day to take proof in the Van Dien case. One trip will cover both cases, and require no other."

Thus two or three dates were fixed for the taking of testimony, and, on the day before, word would be sent by Rosenkrans that the matter would go off and that another day would be set.

At last, in despair, Mrs. Van Dien, on July 21st, 1914, wrote Rosenkrans as follows:

"As we see you are not going to attend to my buness [business] As you promised Mr. Mackey you would sure, have the hearing last Saturday, July 18, We have gave you long enought time. It has bin sence Jan. 6. Now I want my money. I will give you till Saturday, July 25, 1914, to return my money or I will send some one that will collect it for me."

Rosenkrans did not answer this letter, but shortly thereafter saw Vreeland and told him that he had received it and said that as Mrs. Van Dien was dissatisfied he would ask him (Vreeland)

to go to his (Rosenkrans') office and get a check from him to return her the money, and that he (Vreeland) asked him (Rosenkrans) to wait, that he would see her and did not want to receive it for her. On the day following the service of the order to show cause upon Rosenkrans, Vreeland called at his office and was told by him that he (Vreeland) had advised him (Rosenkrans) badly, and he gave him a check for $25 to take to Mrs. Van Dien, which he (Vreeland) tendered to her and she declined to receive it. Mrs. Van Dien says she told Vreeland that she would not take the money until she saw her lawyer, a Mr. McDavitt, of New York, whom she had consulted, he (McDavitt) having told her not to accept it. On the hearing Rosenkrans offered to repay the $25 to Mrs. Van Dien, and I advised her to accept it, which, I understand, she afterwards did.

No petition for maintenance was ever drawn by Rosenkrans and no proceeding of any kind was instituted by him on Mrs. Van Dien's behalf for the support of her child. The matter is at an end as between them, and their relation of solicitor and client has terminated.

As already stated, Rosenkrans testified that at the interview with Mrs. Van Dien, on February 10th, 1914, he had her make an affidavit, which was called for and offered in evidence. It reads as follows:

"STATE OF NEW JERSEY,  }
  COUNTY OF PASSAIC,     }  *ss.*

"Stella M. Van Dien, being duly sworn according to law, on her oath says, that she is the petitioner named in the foregoing petition, and that the matters and things therein set forth are true, to the best of her knowledge and belief.

                                        "STELLA M. VAN DIEN.

"Sworn to and subscribed before
me this tenth day of February,
A. D. 1914.
              "JOHN H. COLLIER,
                  "*Master in Chancery
                      of New Jersey.*"

Here we have a case of a solicitor of this court counseling and procuring a client to make an affidavit "that she is the petitioner named in the foregoing petition," when in fact there was no petition in existence, and, also, "that the matters and

things therein set forth are true, to the best of her knowledge and belief." It is hard to characterize this conduct of Rosenkrans', or, rather, it is hard to refrain from reprobating it as it deserves to be. It is more than strange that Rosenkrans should procure Mrs. Van Dien to subscribe and swear to an affidavit which was untrue in point of fact. He says he intended to draw a petition and annex the affidavit to it. This would have aggravated the matter. If he had done so and had filed the petition he would have uttered and imposed upon the court a false affidavit. His conduct in this regard amounts to malpractice.

Without raising any question as to whether either Rosenkrans or Mrs. Van Dien were guilty of an infraction of the criminal law with reference to this affidavit, it is enough for the purpose of this inquiry to say that Rosenkrans counseled and procured his client to subscribe and swear to an affidavit false in fact—a thing intolerable.

The supreme court (*In re McDermit, 63 N. J. Law 476*) reprobates the breach of that highest trust and confidence which obtains between counsel and client, under which a duty to observe the strictest integrity in his dealings with a client is enjoined, and disbarred a lawyer who had been unfaithful to the instructions of his clients, obtaining from them money for which he failed and neglected to render any adequate service and retained for his own use money which he had received from them for another purpose.

Measured by the standard here set up, Rosenkrans, it will be seen at a glance, has in a great degree abused the trust and confidence of his client, Mrs. Van Dien, and has not observed the strictest integrity in his dealings with her or justly regarded her interests. Nor has he rendered any adequate service to his client for the money which she paid him in the expectation of receiving such service. In fact, he rendered her no service at all.

The supreme court (*In re Simpson, 82 Atl. Rep. 507*) disbarred an attorney and counselor who received and retained for himself the sum of $15 to commence divorce proceedings (he having actually prepared the petition and had his client swear to it), and, subsequently, obtained for his services and expenses in the proceedings various sums, during a period of eight

months, aggregating $50, making $65 in all. The case was not pending (never having been commenced), but counsel, nevertheless, wrote his client in September, having been retained in March, six months before, that the case would be proceeded with, the court having reopened. Late in October he wrote that he would be in Trenton then soon and would advise when the case would be heard. As stated, although the petition was actually prepared and sworn to, it was never filed. The respondent to the rule was disbarred.

The supreme court (*In re Bedle, 87 All. Rep. 100*) disbarred an attorney who collected $150 for his client and converted it to his own use, and also obtained $160 for fees and costs to bring a divorce suit and prosecute it to a decree, but for more than six years did nothing but file a petition, although afforded every opportunity and often pressed to proceed.

The delay in the *Bedle Case* was six years, but the delay in the *Simpson Case* was only eight months. The delay in the matter at bar was seven months. And the amounts varied, being $160 in the *Bedle Case,* $65 in the *Simpson Case* and only $25 in the case under consideration. But there is no rule as to the amount of money that counsel obtains to prosecute a suit, nor as to the length of time that must elapse without such prosecution, before proceedings can be taken to discipline the solicitor for his faithfulness in that regard. Each case depends upon its own facts and circumstances.

Mere delay in prosecuting a client's cause, unless, perhaps, it is so long continued as to be evidence of fraudulent conduct, does not afford the basis for disciplining a solicitor. Mere delay, without more, if brought to the attention of the court, would, of course, result in a reprimand and an admonition to the solicitor to proceed; but when a solicitor receives a fee, especially when it is all he asks, upon a promise to speedily prosecute a client's cause, and then does nothing whatever to that end—does not even start—but, on the contrary, when asked by his client for information as to the status of the cause he falsely informs her that it is pending and is being prosecuted with all convenient speed—in whatever words the idea is conveyed—he is guilty of a fraud upon his client.

The supreme court (*In re Cahill, 66 N. J. Law 527*) laid down three rules which justify the disbarment of an attorney, the last one of which is "such intentional fraud upon the court or a client as shows evidence of moral turpitude," remarking that "for less offences, such temporary suspension, as the court may deem proper punishment, will be imposed."

The offence of respondent to this rule is of a dual character (1) obtaining money from a client upon the promise of prompt professional service without rendering any service, and (2) counseling and procuring her to make an affidavit false in fact in the sense that the alleged facts did not exist, but not false in that it was contrary to existing facts, with intent to make use of the affidavit. (See the remarks as to the sacredness and solemnity of an oath, in my opinion, in the matter of Breidt and Lubetkin filed simultaneously with this.) In the *Cahill Case* it was not held that disbarment must follow either one of the three offences which would justify it—only that such punishment might be inflicted.

Nor does Rosenkrans's offence fall within that in the *Simpson Case,* where the respondent from time to time obtained money from his client under the false pretence that he was prosecuting for her a suit which he had never commenced. In the matter at bar the respondent certainly made false representations to his client as to what he was doing, but did not obtain money upon the strength of those particular promises. He had obtained his fee for work to be done and then failed to do the work he promised to do. To violate a promissory obligation and follow that up with the false assertion, oft repeated, that the promise was being performed, is, in a solicitor, malpractice. In *Webster's New Int. Dic.* malpractice is defined to be:

"Any professional misconduct or any unreasonable lack of skill or fidelity in the performance of professional or fiduciary duties: wrong-doing. A question of professional malpractice or negligence is determined by what might be reasonably required under the circumstances of the case."

With reference to physicians, malpractice, in *2 Bouv. L. Dic. (Rawle's Rev.) 669*, is defined as being either willful, negligent

16

or ignorant. These degrees are equally attributable to the conduct of attorneys and solicitors. While discipliniary proceedings may not be taken against a solicitor for ignorant malpractice; for negligent malpractice he certainly can be censured by the court, and, in gross cases, disciplined; and, for willful malpractice, he can be disciplined even to the extent of disbarment.

This case, like that of Breidt and Lubetkin, was considered at a conference of all the judges of the court of chancery, and in their unanimous opinion suspension from practicing as a solicitor for the term of two years is the proper punishment to be meted out to Rosenkrans for his willful malpractice in the Van Dien matter, and such will be the order. If the order should be violated the respondent will be permanently debarred from practicing in the court of chancery.