In the matter of SIMON HAHN, a solicitor of the court of chancery of New Jersey.

[Decided July 14th, 1915.]

1. P., alleging that his wife had committed adultery with K., retained H. as solicitor to bring suit for divorce against her. H., instead of bringing such suit, sought the paramour K., and informed him that his instructions were to demand $25,000 to save him from the exposure which would follow if suit were brought, offering to refrain from bringing suit if the demand were met. K. yielded and gave H. the $25,000. H. informed his client that he had settled the matter with K., but did not tell him the amount he had received, and gave him $2,000, saying that it was exclusive of his fee and that of the detectives. H. gave the firm of detectives, who had obtained evidence, $9,000, keeping the balance of $14,000 for himself. One year afterward P. and the detectives discovered the amount received by H. for P., and, upon P.'s demand for more money, H. gave him an additional $2,500, making $4,500 in all, and gave the detectives, upon their demand for more, an additional $1,250, making the solicitor's share of the proceeds forty-one per cent., the detectives' forty-one per cent., and the client's, whose cause of action they exploited for their own benefit, only eighteen per cent.—*Held,* that this conduct on the part of H., the solicitor, toward his client, was unconscionable, oppressive and fraudulent, and that, therefore, he should be debarred from practicing as a solicitor.

2. When a contract between solicitor and client shows that the compensation therein fixed is so unreasonably excessive as to amount to extortion or to evince a purpose on the part of the solicitor to obtain an undue advantage of his client, the latter could not have had in view the real nature and effect of the alleged bargain.

3. When a solicitor retains for himself, and permits and aids detectives in diverting, a grossly disproportionate amount of a client's recovery, in the name of compensation for services of himself and the detectives, which services were meagre in point of time and entirely nonexpert, the compensation feature of the transaction is only a name.

4. Lawyers' services are not based upon, nor are they restricted to, mere time service. They are entitled to fees which will adequately compensate them for their services, especially when those services are valuable to their clients, and when recoveries are made, their fees may be, and properly are, somewhat apportioned to the avails gotten for their clients. But a solicitor who performs one day's work for a client, not involving professional skill or ability, and recovers $25,000 for him upon his cause of action, and takes one-half of it under the guise of compensation, is guilty of unprofessional conduct amounting to fraud upon his client.

5. If it were known by solicitor and client that $25,000 could be recovered by the solicitor for the client for services not requiring any

particular degree of skill or ability, or any comparatively appreciable time service, and they entered into a contract to divide that equally between them, then, upon the client's repudiation of that contract, the court would doubtless set it aside and compel counsel to restore to his client all over what would be considered fair and reasonable compensation, upon the principle that the excess was a gift without any consideration to support it, and because the contract was unconscionable, oppressive and fraudulent on the part of the solicitor.

6. If a contract be made between solicitor and client for an equal division of a recovery upon the client's claim for damages for criminal conversation where the amount of recovery is entirely problematical, and upon a cause of action, which, it would seem at best, would not bring for the client more than a small amount, if anything, but which turns out to yield $25,000, because the client's adversary is oppressed by the former's solicitor with threats of exposure (which would have been incidental to suit brought), then it becomes the duty of that solicitor himself to renounce the contract and turn over to his client all but reasonable compensation for his services.

7. The making of the sort of contract above mentioned may be cause for disciplining a solicitor, although, in a *crim. con.* case, he would act in the capacity of an attorney-at-law.

8. A solicitor is guilty of unprofessional conduct in procuring from a client's wife, in the presence of her husband, a sworn confession of adultery, as the confession would not be received in evidence in a divorce case nor in a suit for damages for alienation of the wife's affections—especially when the confession is obtained and used for a sinister purpose.

9. When a solicitor in chancery is called upon to respond to a rule to show cause why he should not be disbarred or otherwise disciplined for unprofessional conduct as a solicitor, and, upon the hearing, it appears that an offence meriting punishment has been committed by the solicitor, not, however, in his capacity as such, but as an attorney of the supreme court, the court of chancery nevertheless will properly discipline the derelict solicitor who has committed the offence, because courts, in disciplining lawyers, are not restricted to offences committed in the particular courts in which the disciplinary proceedings are instituted.

10. Generally it may be said that courts will discipline lawyers for offences involving moral turpitude.

11. A client's adversary has rights which the client's solicitor is bound to regard. One is to deliberate as to whether or not he will pay an enormous demand made upon him or resist the collection of it. If he asks for time to think it over, but is told that the money has to be paid immediately or papers will be filed and he will be exposed, the solicitor is guilty of unprofessional conduct.

---

On order to show cause why the respondent should not be disbarred or otherwise disciplined and punished.

*84 N. J. Eq.*	In re Hahn.

*Mr. Halsey M. Barrett,* for the rule.

*Messrs. McCarter & English,* for the respondent.

WALKER, CHANCELLOR.

Upon reading and filing affidavits made ,by Charles M. Kase, Albert C. Fletcher, Charles S. Peaker and Bertha Peaker, his wife, which charged Simon Hahn with malpractice as a solicitor in chancery, an order was made upon him to show cause why he should not be adjudged guilty and thereupon be debarred from further practice as a solicitor or counselor of this court, or be suspended from practice as a solicitor or counselor for such period as the chancellor should order, or be otherwise disciplined and punished as might be deemed equitable and just.

The gravamen of the charge against Hahn is that he, having been retained by Peaker as his solicitor to prosecute in his behalf an action for divorce against his wife, Bertha Peaker, upon the ground of adultery alleged to have been committed by her with Charles M. Kase, did thereafter and on or about December 30th, 1913, demand, extort and receive from Kase the sum of $25,-000 as the consideration for agreeing to refrain from prosecuting such action for divorce, and did afterwards misrepresent to, and deceive, Peaker concerning the amount of money had and received by him, Hahn, from Kase, in that Hahn represented and stated to Peaker that he received from Kase, for the consideration mentioned, the sum of $6,000, and did thereupon pay and deliver to Peaker the sum of $2,000, which he had received from Kase, with the additional representation that he, Hahn, had paid, or intended to pay, to the Gregory Detective Agency, composed of John and Francis Gregory, the sum of $2,000, being another third of the sum collected, and that he intended to retain for his own use, and as compensation for his services in the matter, the remaining one-third, namely, $2,000; whereas, in truth, Hahn retained for himself and converted to his own use the difference between $2,000, which he paid to Peaker, and such sum .as he paid to the Gregory Detective Agency (the exact amount being unknown), the balance of the $25,000 so paid to him (Hahn) by Kase as the consideration for agreeing to refrain from prosecut-

ing the action for divorce, to wit, upwards of $18,000, without the knowledge or consent of Peaker.

Hahn's defence was, shortly, this: That he was retained by Peaker to commence an action against Kase for the alienation of his wife's affections, who, Peaker, suggested a suit for $50,-000; that he sent for Kase, who came to his office, and, upon being told of Peaker's instructions, he, Kase, offered $25,000; that he, Hahn, sent for Peaker, who came down to his office and signed a release to Kase, expressed to be for one dollar and other valuable consideration, upon delivery of which to Kase, he, Hahn, collected from him $25,000—$20,000 in bills and $5,000 in a check; that he, Hahn, returned to his office and laid down the bills and check on his desk in the presence of Peaker and the two Gregorys, father and son, the detectives who had obtained evidence for Peaker, and said he would draw Peaker a check for $12,500 and retain the balance, $12,500, for his services according to their agreement; that the elder Gregory asked Peaker where they came in, and Peaker asked Hahn if he could not throw off part of his fee as he had to pay the Gregorys; that he, Hahn, finally consented to reduce his fee to $10,250, and was about to count out $14,750 to Peaker, when Peaker said that he, Hahn, should pay the Gregorys $9,000 then, which Hahn did, and gave it to the elder Gregory, who took and counted it and handed $4,500 to his son; that thereupon the Gregorys said they ought to get as much as he, Hahn, and that Peaker said they ought to be satisfied with $9,000; that no agreement was reached and the parties were to settle the next day, and Peaker asked Hahn to give him $2,000 then, and said there would be $3,750 coming to him; that Peaker appeared the next morning and said he had not settled the matter with the Gregorys and wanted him, Hahn, to keep the $3,750 for him until he called for it; that he, Hahn, heard nothing more about the matter until the middle of December, 1914, when the younger Gregory came to his office and accused him of having gotten $60,000 out of the matter; that Peaker visited his office January 4th, 1914, and said he had come to get his money, that he had agreed with the Gregorys, and was going to give them $1,250 out of the $3,750, and wanted Hahn to give him a check for $2,500 and send them a check for

$1,250; that an appointment was made for two o'clock and that Peaker and Francis Gregory came in, and he, Hahn, gave Peaker his check for $2,500, and the next day Francis came in and said they would take $1,250 (having left his office dissatisfied the day before), and reluctantly signed a receipt for $10,250, which the agency had received out of the proceeds of the settlement; that no divorce proceedings were ever mentioned.

There are three disputed questions of fact to be considered— (1) Was Hahn retained to prosecute a suit for divorce or for alienation of affections? (2) Did he agree to divide equally with Peaker any sum he might collect from Kase? (3) Did Hahn disclose, in December, 1913, to Peaker and the Gregorys the amount which he collected from Kase?

1. Was the suit to have been one for divorce or for alienation of affections: Charles S. Peaker, who was a cab driver, testified that he visited Hahn's office with Francis Gregory, and that he, Peaker, made an appointment with Hahn for a later hour that day, when he again went to Hahn's office and informed him, Hahn, of the facts of his case and asked Hahn if the evidence was strong enough for a divorce, and if so, to go ahead with the case; that Hahn said he would draw the papers, and when he got them prepared would send for Peaker; that later, by arrangement, Peaker brought his wife to Hahn's office and Hahn informed her that her husband had brought him evidence to secure a divorce, and she said she was willing to make an affidavit of the story, which Hahn wrote down and read to her and she signed and swore to it.

Bertha Peaker, who was a domestic servant, and who was living apart from her husband, testified that she met him pursuant to appointment and went with him to Hahn's office, and that when they went in Hahn said something about the divorce, and he then drew the affidavit about her relations with Kase, which she signed and to which she swore.

Charles M. Kase testified that Hahn sent for him and he went to his office; that then and there Hahn told him that he would probably get into a great deal of trouble if he did not meet the wants of a man who was going to bring a suit for adultery; that he took out a bunch of papers and laying them down said that

if the demands were not met he, Hahn, would have to go to Trenton that night and start divorce proceedings; that he, Kase, asked what was the sum demanded, and Hahn said $25,000, and that Peaker would not take a cent less; that it had to be paid that afternoon or night or the papers would be sent to Trenton and they would get there early the next morning.

Albert C. Fletcher, Kase's secretary, testified that Hahn came to Kase's office on December 30th, 1913, and requested Kase to settle the Peaker matter for $25,000, saying refusal would mean Kase's everlasting disgrace, and he heard him, Hahn, mention divorce proceedings.

Thus it appears that four witnesses, Peaker and his wife, Fletcher and Kase, testified that divorce proceedings were the subject of Peaker's intentions, while Hahn alone denies it. Whether a divorce or a *crim. con.* proceeding was contemplated can make no difference as to the receipt and disbursal of the money by Hahn, except as the question bears upon the jurisdiction of the court of chancery in this proceeding. That question will be considered and disposed of hereafter.

2. As to any agreement for Hahn's compensation: Peaker says that on the afternoon of December 29th or 30th, 1913 (it was the latter date), Hahn sent for him and said he had settled the case out of court and that "here is $2,000 for you and I have got my fee, too. Here is $2,000 for you, exclusive of my fee and the detectives' fee." Peaker said that he did not ask him, nor did he tell him, how much he proposed to keep for himself or to pay the Gregorys; that a little over a year afterwards (January 5th, 1915) he, Peaker, went again to Hahn's office and said that he had heard some talk about the case, and said he thought Hahn had "double-crossed" him; that Hahn had received a large sum of money and did not tell him, and that he did not know what Hahn got nor what he paid the Gregorys, and if Hahn received $25,000, which he heard he had, then, he, Peaker, said he thought he was entitled to more money, to which Hahn replied that he was right and that he would give him more money, which he did, and gave him a check for $2,500.

Hahn's story is that his agreement with Peaker was to divide equally fifty per cent. to each, as already stated.

There is indirect corroboration of Peaker upon the subject of Hahn's compensation in the testimony of Francis Gregory, who said, on his direct examination, that they (the Gregorys) never sent a bill for services and never demanded from Hahn any particular sum, and did not think they had any agreement; that Hahn made the payments voluntarily. When recalled, however, he said he wanted to correct a mistake in his former testimony, and then testified that there was an agreement to split the money into thirds, one-third to Hahn, one for Peaker and one for the Gregorys. The testimony is not very clear or satisfactory on this point, but if there were an agreement to divide the proceeds into thirds, then Hahn's testimony, that it was to be divided into halves, and that the Gregorys were to be paid by Peaker out of his half, is untrue. As a matter of fact, when the whole sum was at last distributed, Peaker, whose cause of action Hahn and the Gregorys exploited almost exclusively for their own benefit, received but $4,500, while Hahn got $10,250, and the Gregorys a like sum of $10,250. In other words, Peaker's share of this nefarious business was eighteen per cent., while Hahn and the Gregorys (together) each got forty-one per cent., or, in other words, the solicitor's and detectives' share, together, was eighty-two per cent., while Peaker's was only eighteen per cent.

3. Did Hahn, in December, 1913, disclose to Peaker and the Gregorys the amount he received from Kase? Peaker says that when sent for by Hahn, after he had collected from Kase, that he, Hahn, gave him $2,000 and informed him that that was exclusive of his fee and the detectives', without being asked by Peaker how much he had collected and without informing him, and that he, Peaker, had no idea what Hahn and the Gregorys got.

John Gregory testified that Hahn sent for him December 30th, 1913, and he went to his office. Francis Gregory was there. He, John, says he was not sure whether Hahn gave the money to Francis and Francis gave it to him or whether Hahn gave it to him directly, but he got $4,500 in bills, and Hahn said, "How is that, Chief, how is that?" and Gregory replied that it looked pretty good to him, and put it in his pocket; that he did not know how much Hahn had gotten or what he was going to keep,

but said there was a kind of an agreement about three one-thirds —three parts; his agency was to get one, Hahn, he supposed, another, and he did not know about Peaker, but supposed he got the other; that at the time he, John Gregory, got his $4,500, Francis was given $4,500, too. Recalled, John Gregory testified that when he got to Hahn's office on December 30th, 1913, his son Francis and Judge Hahn were there; Peaker was not, he came in afterwards; that he, John, was present when Peaker was paid $2,000; that it is not true that Hahn gave Peaker $11,000 in bills or that Peaker after receiving them handed $9,000 in bills over to Francis, who received it in his presence from Hahn; that Peaker, he thought, was not present when he and his son received the $9,000 in bills.

Francis Gregory corroborates his father, and, on his recall, testified that on December 30th, 1913, he saw Hahn and Kase at the bank and saw money handed to Hahn by the teller; that he followed him back to his office and that Hahn sent for the elder Gregory and Peaker and informed him, Francis, before they got there, that he got $20,000; that Hahn did not in his presence or in the presence of his father and of Peaker, lay out $20,000 in bills and a check for $5,000; that there was never any discussion as to how much the Gregorys were to receive; that Hahn did not say that he was to receive one-half and was about to give Peaker a check for $12,500; that nothing was said about a check at all; that he saw Hahn give Peaker $2,000; that Peaker was not present when the Gregorys got the $9,000.

Peaker was not asked by either of the examining counsel as to who was present when he got the $2,000 from Hahn.

Now, if Peaker tells the truth he had no agreement whatever as to the amount of Hahn's fee. Hahn, who says that his fee was agreed between him and Peaker to be fifty per cent., stands alone in this assertion, and if the other three witnesses are to be believed either there was no agreement as to any amount, or it may be that it was to be thirds instead of halves.

The methods by which this collection was made from Kase is significant upon the *bona fides*, or rather lack of it, of this whole transaction. Succinctly stated this is what happened: On December 30th, 1913, the day after Hahn secured Bertha Peaker's

affidavit admitting her meretricious relations with Kase, Hahn called Kase on the telephone and requested him to come to his, Hahn's, office. This Kase did, and Hahn informed him of the matter in hand and demanded $25,000 to settle, exposure being the penalty for refusal. Kase asked a little time to think it over and was permitted to go back to his office for the purpose, where Hahn soon followed him. Kase said he had concluded to meet the demand, but thought it doubtful whether they could get any money at that time of the afternoon, the banks being all closed. Hahn told him to draw his check and he would go with him and get the money. A check for $20,000 on the Fidelity Trust Company, and another for $5,000 on the Union Bank, were drawn by Kase to the order of cash. The $20,000 one was endorsed by Kase and the $5,000 by Hahn. They went to the Fidelity Trust Company's banking house and there the teller handed $20,000 in bills to Hahn in payment of the larger check, in the presence of Kase. It was conceded to be impossible to get any money from the Union Bank that afternoon, and Hahn collected that check himself the next day.

Hahn, claiming to be prosecuting an honest claim for damages, having in his possession checks for $25,000, given by a responsible man to whom he had given a release from his client, made the unusual and extraordinary demand that the victim accompany him to a trust company upon which the check for $20,000 was drawn, and which, because it was a trust company as well as a bank, kept later hours than an ordinary banking institution, and induced them to do the unusual thing of paying $20,000 in cash on a check after banking hours. Of course they would do this only for a good customer and responsible man. This gives evidence of the desperation with which Hahn pursued Kase after he found him weak enough to yield to the unconscionable and outrageous demand made upon him, more in Peaker's name than on his behalf. I call the demand unconscionable and outrageous because only a small recovery, if any, could have been obtained for Peaker from Kase, in my judgment, if a suit for the alienation of Peaker's wife had been brought, for reasons which will be hereinafter stated.

To my mind the testimony shows that Peaker sought Hahn to bring a divorce proceeding for him against his wife; that Hahn considered Peaker a man who would be more gratified by a sum of money than a decree of divorce, and, knowing Kase to be a rich man, and probably a weak one also, he bethought him he would endeavor to frighten Kase into making a settlement, and was probably as much surprised as gratified when Kase so readily agreed to the payment of such an exorbitant sum as $25,000 to save himself from exposure. Further, that there was no agreement whatever between Hahn and Peaker as to a division of the money from Kase, and if this be correct, then, of course, there was no agreement between them as to fees, but Hahn gave Peaker $2,000, a sum which he thought would more than amply gratify him and preclude any suspicion coming into his mind about the honesty of the transaction, for Peaker could have had no idea that Kase had paid $25,000 to save himself from being exposed in his meretricious relations with his, Peaker's, wife.

Perhaps I ought to advert to a feature of the testimony which was made much of on the argument by counsel representing the respondent. Peaker, in his preliminary affidavit in this matter, obtained by Mr. Barrett, who was assigned by Vice-Chancellor Howell to investigate this matter when rumors of it reached him, swore as follows:

"On December 30th, 1913, I was at the office of the Gregory Detective Agency, No. 828 Broad street, Newark, N. J. Hahn called up there on the telephone and said he wanted to see me. Gregory told him I was there and that I would go down to Hahn's office at once. I went. I think this was about five o'clock in the afternoon. Hahn told me that he had seen Kase and that Kase had paid him $6,000."

On the witness-stand before me Peaker testified, as already stated, that when Hahn sent for him and gave him the $2,000 he did not tell him how much he had recovered from Kase. He was called on to explain the discrepancy between his affidavit and his examination in court and made the following answers to questions by Mr. Barrett:

"A. Now, your Honor, with all due respect to you [Mr. Barrett], I will explain that to you; as I said, with all due respect to you, I did up at the office when you [Mr. Barrett] asked me, you asked me when Hahn gave me $2,000 if he told me he had received $6,000, and I said, 'No, sir, he did not tell me what he had received;' then you said, 'Well, being he had given you $2,000, did you suppose he had received $6,000?' I said, 'I didn't have any idea at all what he had received;' you asked me that in your office.

"Q. Well, now then, can you answer the question how you got the impression that Mr. Hahn had received $6,000?

"A. How I got the impression?

"Q. Yes; was it, as you now say, because you understood me to say that it was six?

"A. That is the idea exactly; I wouldn't have thought anything about any amount at all, because I didn't have any idea what he had received."

It is perfectly obvious that Mr. Barrett, a high-minded and honorable lawyer, would not have written into Peaker's affidavit the statement that Hahn informed him, Peaker, that he got $6,000 unless he, Mr. Barrett, got the idea from Peaker, and Peaker at the time he swore to the affidavit must have had a rather vague and indefinite recollection about the particular matter, or passed it by unnoticed, or else sworn falsely. I am convinced it was not the latter. In the first place, he had no object to swear except according to the fact. In the second place, he impressed me as an entirely candid and truthful man. But, even if he swore falsely as to whether Hahn told him what he received from Kase, that does not change the salient facts in the matter at bar. Even assuming that Peaker told an untruth in the affidavit, and invoking against him the doctrine *falsus in uno, falsus in omnibus,* that cannot operate to annihilate facts otherwise proved. However, as already intimated, I believe that an honest mistake was made in some way between Mr. Barrett and Peaker with reference to this fact in the affidavit, and that in this way the discrepancy in the testimony is to be accounted for. I regard it as an honest mistake.

The question of the legality of the contract for fees, said by Hahn to have been made between himself and Peaker, assuming the transaction to be as Hahn says it was, will now be examined.

In *2 Thornton on Attorneys 745* § *431,* it is laid down:

"Where a contract of employment between attorney and client is procured by unfair means, and the compensation therein fixed is so unreasonably excessive as to amount to an extortion, or to evince a purpose on the part of the attorney to obtain an undue advantage of the client, the contract will be deemed to be an unconscionable one, and may be set aside on the client's application; the attorney being allowed only the reasonable value of the services rendered by him in good faith. In such cases the burden is on the attorney to show that the contract was free from fraud, undue influence, or exorbitant demand. The court will not, of course, interfere with lawful contracts for compensation in which the charge made is not out of proportion with the services rendered."

Quite in line with the text of Mr. Thornton is the case of *Colgan* v. *Jones, 44 N. J. Eq. 274,* where the court of errors and appeals adopted the conclusions of Williams, advisory master, who said (at *p. 276*) :

"It seems clear in this case that without attributing any misrepresentation to the attorney, the parties could not have had in view the real nature and effect of the alleged bargain. The value of the subject-matter could not, from the nature of the case, have been equally or fairly understood by them, nor any approximation of it. It was, in effect, only an arrangement for a contingent fee, which is always under judicial control; for, being made by guesswork, a species of (perhaps innocent) gambling, it would be dangerous to decline such control as a matter of public policy. If, however, these parties can be supposed to have known, with some correctness, the value of the thing they were dealing with, then the inference of fraud on creditors would be irresistible to my mind. A poor laboring man, disabled, more or less, by his injury, knowing that his claim is worth some $4,-000, or thereabouts, gives it all to his lawyer, under the name of compensation, for getting it. Evidently, this is only a name. The affair is a gift of so much as exceeds just compensation; and, if the man is indebted, cannot stand as against his creditor.

"But how can we believe that it was even intended as a mere gift? It is contrary to human experience that a man so situated should give away a large sum understandingly."

In *Tate* v. *Field, 60 N. J. Eq. 42,* Vice-Chancellor Pitney held :

"Where a bill rendered by an attorney for prosecuting a suit for his client is not only fraudulently untrue as to items for services not rendered, but inflated throughout by charges beyond what the services were worth, and, with the retainer paid by his client, amounts to more than the sum recovered of defendant, it is within the rule that if the behavior of the attorney towards his client is dishonest, oppressive or illegal, and shows a fraudulent intent, the court may proceed summarily against him for his misconduct."

In *Morehouse* v. *Brooklyn Heights Railroad Co., 185 N. Y. 520* (at *p. 525*), it was held:

"Of late years the subject of attorneys' fees, and their manner of procuring contracts of retainer, especially in negligence cases, have attracted the attention of both the public and the courts. The charges made in some cases have been exorbitant, if not scandalous, and have tended in a measure to bring the profession into disrepute. It is contended that a claimant who is poor and unable to pay his attorney in cash ought to be permitted to contract to pay a portion of his claim to his attorney, in order to procure his services. The validity of such contracts is not questioned. It is only where the attorney has taken advantage of the claimant, by reason of his poverty or the surrounding circumstances, to extort an unreasonable proportion of such claim that it is condemned. The federal courts have recently, in two instances, characterized a contract of retainer giving to the attorney fifty per cent. of the recovery as unconscionable. *Herman* v. *Metropolitan Street Railway Co., 121 Fed. Rep. 184; Muller* v. *Kelly, 125 Fed. Rep. 213.* The appellate division in the first department has also denounced such contracts. The question, however, as to whether such a contract is unconscionable, is one of fact depending upon the character of the claim and the amount of services rendered in prosecuting it to judgment. An agreement to pay an attorney one-half of the recovery, where the action was to recover a penalty of $50, would not by any person be considered to be improper, but if it was for $50,000, it might be considered quite improper. So, that the mere fact that the attorney under the agreement was to receive one-half does not render it unconscionable, unless it appears from the evidence

that it was induced by fraud, or, in view of the nature of the
claim, that the compensation provided for was so excessive as to
evince a purpose on the part of the attorney to obtain an im-
proper or undue advantage over his client. *Matter of Fitzsimon,
174 N. Y. 15.*"

In *Dorr* v. *Camden, 55 W. Va. 226* (at *p. 234*), it was held:

"A contingent fee is only permitted to attorneys as reward for
skill and diligence exercised in the prosecution of doubtful and
litigated claims, and is not allowed for the rendition of mere
minor services which any layman or inexperienced attorney
might perform.

"It is the skill, diligence, ability, experience, judicial knowl-
edge and judgment of the attorney that is thereby rewarded, and
the performance of duties that require no such qualities is wholly
insufficient to sustain such fee, as the true measure of such ser-
vices can be ascertained on a *quantum meruit*.

"The evidence of this case clearly shows that the only duty
the plaintiff was to perform was to furnish the evidence of him-
self, Winchester, Butcher and Hutton, and the record and de-
cision in the case of *Camden* v. *Dewing* shows the case wholly
depended on the evidence of Winchester, Butcher and Hutton;
all of whom were under obligation to the defendant as his fully
compensated agents, to furnish him their evidence free of charge
or compensation of any kind whatsoever. It is therefore clear
from the proofs that the plaintiff did nothing requiring skill,
diligence, experience, ability, legal knowledge or judgment, en-
titling him to a contingent fee for legal services, and, as before
seen, the contract, if entered into at all, was coerced from the de-
fendant by the unfair advantage taken of him by his agents,
withholding from him information that belonged to him."

These cases were civil suits between party and party concern-
ing fraudulent and unconscionable contracts negotiated by at-
torneys with clients, whom they were bound to protect and not
to oppress; and if this were such a suit, I would have no diffi-
culty whatever in reducing the fee of counsel to far less than he
gave Peaker, and to award Peaker more than counsel retained
for himself and permitted the detectives to obtain. This matter,
however, is disciplinary, looking to the suspension or expulsion

from the chancery bar of the solicitor who fraudulently and oppressively extorted an unconscionable contract from his client, and, incidentally, permitted his client's recovery to be extortionately levied on by detectives—assuming the transaction to be as he states. But, as already said above, I am clearly of opinion that no such bargain for fees between the parties was made, and in such a posture the solicitor's conduct becomes manifoldly more fraudulent, oppressive and unconscionable.

A bare statement of the facts of the case at bar, as to the alleged contract, shows that "the compensation therein fixed is so unreasonably excessive as to amount to extortion, or to evince a purpose on the part of the attorney to obtain an undue advantage of the client" as laid down by Thornton; that "the parties could not have had in view the real nature and effect of the alleged bargain" as in *Colgan* v. *Jones.* In that case Advisory Master Williams remarked that a gift of all of his claim, by a poor laboring man disabled by injury, to his lawyer, in the name of compensation for getting it, was only a name; that it was contrary to human experience that a man so situated would understandingly give away a large sum. Equally, in this case, it is unbelievable that Peaker could have known or understood it to be possible to obtain $25,000 from a man for committing adultery with his wife, who, by the way, gave herself up to him willingly, and at whose offence he, Peaker, appears to have connived. The comparative enormity of the recovery in this case is what renders the sum taken under the guise of compensation unconscionable, as hinted at in *Morehouse* v. *Brooklyn Heights Railroad Co.* Again the meagre and inexpert services performed by Hahn for Peaker, services which any inexperienced attorney might have performed, are "wholly insufficient to sustain such fee" as was said in *Dorr* v. *Camden.*

As is well known, exemplary damages are recoverable in *crim. con.* suits, and yet the conduct of the wife with her paramour may be given in evidence in mitigation of damages. *Foulks* v. *Archer, 31 N. J. Law 58; Ferguson* v. *Smethers, 70 Ind. 519.* In the latter case the court observed (at *p. 520*) :

"The circumstances attending the adultery—as to whether the wife was sought or threw herself in the way of her paramour,

and as to whether she was overcome by persuasion, or gave herself away willingly—may be given in evidence as affecting the question of damages."

It is to be born in mind that Peaker is the man whose wife's affections were said to have been alienated from him, and for which it is said he was entitled to damages. He wrote his wife a letter dated December 25th, 1913, which was received by her and in pursuance of which she met him and went to Hahn's office where she made the sworn confession. The letter was offered in evidence and reads as follows:

"Dear Bertha this is certainly A swell Christmas Day but it is just as good to me and I suppose you also if you are over the hot stove which you are I believe. Well Sweet I had A talk with my Friend A Lawyer & he said if you would come down to Newark Monday afternoon he would fix it up for me, but mind you this is to be strictly private only the ones concerned in it must know any thing about it as He would not do this for any body else under any circumstances, so I told him I would guarantee him any thing contracted between you and I as far as we were concerned would be absolutely safe so after I get straight with you I will hike it as soon as I get straight but until you are married again after we are Divorced I want you to keep in touch with me if you feel so disposed for I will never wish you any ill will and hope the same from you so if you can meet me Monday after noon let me know or if not let me know when it will be convenient for you and I will meet you at the Central Depot on Broad st. then there will be no danger of the Boss seeing us together therefore it will not hurt your standing with Him, answer me by Saturday so I can make the appointment with the Lawyer, it will not take us over ½ hour so you see we can make it short. All at Present I remain the same old Cranky Hubby Charles Peaker with love　Happy Christmas & A Merry New Year　get me Steve."

In this letter Peaker invites his wife to meet him and go to a lawyer's office and says that until she is married again after they are divorced he wants her to keep in touch with him if she feels so disposed for he will never wish her any ill-will and hopes the same from her. He goes on to say there will be no danger of the "Boss" seeing them together, therefore it will not hurt her own standing with him. This can mean none other than Kase, for Peaker had been told by his wife that she was having relations with Kase, and, in consequence of this information Peaker instructed the Gregorys to shadow her at Kase's

office and get evidence. Here is a plain case of consent by Peaker to his wife's adultery with Kase, which, in fact, he proposed to make a cause for divorce, and to remain thereafter on terms of friendship with her. It amounts to giving her to Kase. I think that nominal damages would have been about all that could have been recovered, if any, on Peaker's alleged cause for action against Kase for alienating his wife's affections, for if a husband consents to, or connives at, the wrong, he cannot maintain an action for criminal conversation. *21 Cyc. 1627.*

It will not be out of place here to inquire as to what services Hahn performed for Peaker. They met by introduction of the younger Gregory one day, and Peaker visited Hahn's office later and stated the facts of his case to him. It may be assumed that all this took a couple of hours. Next day Peaker visited Hahn's office with his wife who reiterated the story and signed and swore to a confession which Hahn drew. It may be assumed that this took three hours. That makes five hours, or, say, one-half of a day. Hahn's transaction with Kase was all in the afternoon of December 30th, 1913, which was less than half a day. Later in the evening of that day Hahn sent for Peaker and gave him $2,000, and gave $9,000 to the Gregorys, the latter dole unbeknown to Peaker. All this may have taken a couple of hours. I reject Hahn's statement to the effect that Peaker appeared at his office the next morning and told him that he had a settlement yet to make with the Gregorys and that he wanted Hahn to keep the rest of the money ($3,750) for him until he called. Peaker and the Gregorys deny this. Thus, practically, it will be seen, that Hahn's services in this matter occupied about one day's time.

Of course lawyers' services are not based upon, nor are they restricted to, mere time service. They are entitled to fees which will adequately compensate them for their services, especially when those services are valuable to their clients, and, when recoveries are made, their fees may be, and properly are, somewhat apportioned to the avails gotten for their clients. The same amount of time might be devoted to the interests of a client where no money passed, and the charge would be, perhaps, nominal, if the client were of little ability to pay. And, on the

contrary, for the same amount of services in time, where the recovery was large, compensation might run into hundreds or even thousands of dollars. But a solicitor who performs a day's work for a client and recovers $25,000 for him upon *his* cause of action, and takes one-half of it under the guise of compensation, is guilty of unprofessional conduct amounting to fraud upon that client. If it were known by solicitor and client that $25,000 could be recovered by the solicitor for the client upon services not requiring any particular degree of skill and ability, or any comparatively appreciable time service, and they entered into a contract to divide that equally between them, then, upon the client's repudiation of that contract the court would, in my opinion, unhesitatingly set it aside and compel counsel to restore to his client all over what the court would consider fair and reasonable compensation, upon the principle that the excess was a gift without any consideration to support it, and because the contract was unconscionable. If, on the other hand, a contract be made between solicitor and client for an equal division of a recovery upon a client's claim, where the amount of recovery is entirely problematical, and upon, as in this case, a cause of action, which, it would seem at best, could not bring for the claimant more than a small amount, if anything, but which turns out to yield $25,000, because the client's adversary is oppressed by claimant's solicitor with threats of exposure (which would have been incidental to suit brought), then, I say, it became the duty of that solicitor himself to have renounced the contract and turned over to his client all but reasonable compensation for his services.

Advisory Master Williams well said in *Colgan* v. *Jones* (at *p. 275*) :

"The right in action belonged to Colgan, and the judgment was recovered for him and in his name, and became, on its recovery, an asset liable to his creditors."

This observation has especial appositeness to the case at bar. Here the cause of suit or action was Peaker's, not Hahn's, and when the $25,000 was obtained by Hahn it was recovered for Peaker and not for Hahn plus the Gregorys. Yet the conduct of Hahn and the Gregorys would indicate that they regarded

and dealt with the cause of action as theirs, or at least that they appropriated it to themselves and made Peaker a mere cat's-paw in the game of mulcting Kase.

Now, if Hahn's extortionate charge against his own client is to be reprobated, and indeed it is, what shall I say of his per- mitting these detectives, the Gregorys, to possess themselves of $10,250. of Peaker's money for services not requiring any de- tective skill and which could have been equally well performed by anyone.    Francis Gregory, who did the "shadowing," was informed of the time when Bertha Peaker would visit Kase's office, and he watched the office and saw her go in and come out five or six times, devoting an hour or so to each occasion.   .Be- sides this, Peaker had several interviews with the agency.   By no stretch of the imagination could the Gregorys' services have consumed more than two days' time.    I understand that de- tectives charge from five to twenty-five dollars a day for their services.    Upon the basis of time service the Gregorys would probably have been well paid with $50 and overpaid with $100. And yet, notwithstanding this, Hahn, the solicitor, permits the Gregorys to share equally with him in the "spoils"—for such, I think, the $25,000 may well be called—giving them first $9,000 and then $1,250, when, by the way, they only claimed that there was to be a division into thirds, which would have made their· compensation $8,333.34 instead of $10,250.    But, of course, there was no such agreement, for, if there had been, Hahn would not have given the Gregorys $9,000 on the night of the settle- ment and $1,250 in January, 1915, as "hush money," for such it was.    It was a veritable case of "addition, division and silence," with silence broken and the usual result—exposure!

The authorities to which I have just referred—*Thornton on Attorneys, Colgan v. Jones, Tate v. Fields, Morehouse v. Brook- lyn Heights Railroad Co.* and *Dorr v. Camden*—concern causes between parties and solicitors with reference to unconscionable and extortionate contracts between them.    But, *In the Matter of ————, an attorney, 86 N. Y. 563,* the sort of a contract here under discussion was distinctly held to be a cause for disciplining an attorney who was disbarred.    Said Chief-Justice Folger (at *p. 573*) :

"Another matter presented to the general term was this: The appellant procured a pension .for one who had employed him and received arrears of pension and the monthly allowance for some months. Of the money he received he did not pay over to the pensioner the sum of over $1,200 out of a little over $1,700 received by him. He avers that he agreed with his client that he was to retain all over $8 per month of the moneys that were paid by the government. This was an unconscionable agreement to be made by an attorney with a client. It is worse, when it does not appear that the client was informed or knew how much over $8 per month were the sums the government would pay. *White* v. *Whaley, 3 Lans. 327*. We cannot say that the general term erred in deeming this transaction indicative of a depraved professional morality. There may have been good reasons why the United States court held that the facts shown to it did not sustain the indictment on which the appellant was tried. That decision does not soften the effect of those shown to the general term."

As already intimated, however, the opinion at which I have arrived, and the result of it, is not based upon a contract unconscionable, oppressive and fraudulent, but upon such conduct by a solicitor toward a client, without any contract between them, including, also, the withholding of information from the client as to the amount of money recovered for him.

It will not be out of place to mention the fact that Hahn was guilty of unprofessional conduct in procuring from Peaker's wife her sworn confession of adultery.

In *Summerbell* v. *Summerbell, 37 N. J. Eq. 603*, coercion was practiced upon a wife by her husband who stood by while she wrote and signed confessions which were witnessed by a woman who attended at the husband's invitation (at *pp. 604, 618*). And Gummere, advisory master, in this case held (at *p. 617*) :

"In conclusion, I am of opinion that the confession in this case was not collusive, but that it was procured by the complainant to be used as evidence of his wife's adultery, and that it is open to the legal presumption of having been procured by the influence of the complainant exerted over his wife for that purpose, and that for both of these reasons it is insufficient corroborative proof of the fact of adultery." And Mr. Justice Van Syckel, in

the same case, speaking for the court of errors and appeals, said (at *p. 619*) :

"A confession procured under such circumstances cannot be regarded as the free and voluntary declaration of the wife, but must be treated as the product of his restraining influence exerted over her feebler will. It was penned by the hand of the wife, but is none the less the language and voice of the husband.

"The attestation clause by which the complainant sought to remove the presumption of constraint, which he knew must attach to it, only adds to the suspicion with which it must be received.

"The analogies of the law lead us to discredit and discard all testimony which is marked by this infirmity. A confession procured from an accused through inducements held out to him is utterly rejected as evidence. No responsibility attaches for an act done under duress. Even in certain crimes committed by the wife in presence of her husband, the law does not charge her with the guilt of the offence, but imputes her conduct to his coercion.

"If these ancient principles of the law are wisely founded, what probative force should be given to the wife's confession of guilt put forth at a time and place appointed by the husband; before a witness summoned by him, attested by a clause drawn by his hand, and written and signed in his presence and under his eye, with the purpose of using it against her?

"In my judgment, self-accusation thus procured is unworthy of credit, and cannot be a safe basis upon which to build up and support a charge of adultery against a wife."

The situation is not at all changed because Mrs. Peaker said in her sworn confession : "I am making this affidavit of my own free will and without any coercion."

In the *Summerbell Case* (at *p. 619*), the attestation to the confession read: "I have written the within without dictation or control by my husband or any other person, without any promise or threat, and sign in presence of Miss Caroline Forman as witness." Afterwards the wife signed another confession which commenced: "By this writing I bear witness willingly and without dictation or compulsion, in the hope alone that my husband

will pardon my faults," &c. And Mr. Justice Van Syckel said (at *p. 619*) :

"The language of this paper, and that in the attestation clause, leave no doubt in my mind that they were drawn by the husband after consultation with counsel, to be used, as they have been used, as a means of proving the wife's adultery."

As the confession of Mrs. Peaker would not have been received in evidence in a divorce case (*Summerbell* v. *Summerbell, supra*), neither would it have been received in a suit for damages for alienation of the wife's affections, for the Evidence act provides that nothing contained in it "shall render any husband or wife competent or compellable to give evidence for or against the other in any action for criminal conversation, except to prove the fact of marriage." *Comp. Stat. p. 2222* § *5.*

Hahn knew, and even Peaker and his wife are presumed to have known, that this affidavit was valueless as evidence. It would seem, therefore, that it was procured by Hahn to become the engine of oppression against Kase; and it had that effect. The expression in the handwriting of Hahn that the confession of Bertha was made of her own free will and without coercion goes far to throw light upon the character of this transaction and Hahn's connection with it. Bertha's declaration as to that is the judicial language of a trained lawyer put into the mouth of a domestic servant. I regard this sworn confession as a flagrant piece of unprofessional conduct on Hahn's part.

It has already been stated that Hahn's claim is that he was not retained to prosecute a divorce suit but one for alienation of a wife's affections. This defence is aimed at the jurisdiction of this court, the contention being that the offence, if any, was committed by Hahn in his capacity as an attorney-at-law and not as a solicitor in chancery. I have already determined, upon the facts, that his retainer was to bring a divorce suit. He successfully turned it into a demand for a money consideration to suppress a divorce suit or to settle a *crim. con.* accusation. True, Hahn had Peaker sign a release to Kase on the day he got the money, December 30th, 1913. It is filled out in a general release blank, and, after the usual *omnibus* clause, written in by Hahn, is the following :

"And in particular all claims I have against the said Charles M. Kase on account of his alienating the affections of my wife Bertie Louise Peaker, and his having committed illicit intercourse with her."

This release is expressed to be made for and in consideration of the sum of "one dollar and other valuable consideration." This speaks volumes in corroboration of Peaker's claim that he did not know how much money Hahn obtained from Kase. If this were a *bona fide* transaction, which Hahn says it was, in which Peaker instructed him, according to his own statement, to demand $50,000 damages, then surely, when he, Hahn, at last got down to settling for $25,000 he would have informed Peaker and had the amount written in the release so that Peaker would know that Hahn was telling him the truth and that he was to get no more than the latter sum. True, Hahn testified that Kase asked him to write the consideration as $1. Kase says nothing of the kind, only that he demanded a release. Hahn did not instruct his counsel to cross-examine Peaker on this question, nor did he ask Kase anything about it. This testimony of Hahn's was brought out by a question of mine. Hahn testified that he sent for Peaker and told him that Kase had submitted a proposition to settle for $25,000. I then asked Hahn why he did not write the amount in the release, and he said he had spoken to Kase about it and he told him to put in the amount as $1.

It would be absurd to think that Kase had any desire in that regard. He wanted a release for his protection, and that, under the hand and seal of Peaker, being in full for any and all demands to date, would have been equally as good a defense against the claim which was compromised, had it expressed the real or only a nominal consideration.

Again assuming that Hahn's version of the matter is correct, and that he was retained to prosecute a *crim. con.* instead of a divorce suit, nevertheless, this court has jurisdiction of his offence. It may be that if there were no question but that the claim was one for damages for alienation of affections that the court of chancery would not have commenced this prosecution, but would have brought the matter to the attention of the supreme court, if it were not already aware of the facts. But

when a solicitor in chancery is called upon to respond to a rule to show cause why he should not be disbarred or otherwise disciplined for unprofessional conduct as a solicitor, if, upon the hearing it appears that an offence meriting punishment has been committed by the solicitor, not in his capacity as such, but as an attorney of the supreme court, this court, nevertheless, will properly discipline the derelict solicitor who has committed an offence in his capacity as attorney, because courts are not restricted in their power to discipline lawyers only for offences committed in the particular court in which the disciplinary proceedings are instituted.

In *State* v. *McClaugherty, 33 W. Va. 250*, it was held:

"That when an attorney commits an act, whether in the discharge of his duties as an attorney or not, showing such want of professional or personal honesty as to render him unworthy of public confidence, it is not only the province, but the duty, of the court, upon proper presentation of the case, to strike his name from the roll of attorneys."

In *re Wilson, 79 Kan. 674*, it was held that whenever one who was in fact a lawyer accepted employment to act for some one else in a business transaction, in the course of which he received money belonging to his employer, his wrongful detention of it is a sufficient ground for his disbarment, although he may not have been called upon to give legal advice or to take part in litigation; that "such conduct would justify excluding him from the practice of the law, as it would certainly be a just cause of refusing an application for admission to the bar"—citing *In re Smith, 73 Kan. 743*. In this case the amount of money received and misappropriated was inconsiderable.

*In re O———, 73 Wis. 602*, it was held:

"The misconduct which will warrant the suspension of an attorney is not limited to acts committed strictly in a professional character, but extends to all such misconduct as would have prevented an admission to the bar.

"In proceedings instituted in the court of his residence, such court may disbar or suspend an attorney for professional misconduct before officers of the United States land office."

These last citations are ample authority as to the power of

any court possessing inherent jurisdiction to discipline lawyers such as this court has (*In re Raisch, 83 N. J. Eq. 82*), for offences committed not in their capacity as officers of the particular court, if, indeed, any authorities were necessary to support so obvious a proposition.

Now, for what causes will courts discipline lawyers? Generally, it may be said that they will be disciplined for offences involving moral turpitude.

*In re Charles A. Thatcher, 80 Ohio St. 492*, it was held:

"The real question in cases of this kind is whether under the facts admitted and proved the respondent appears to be a fit person to be longer allowed the privilege of an attorney; whether he has shown himself, by lack of appreciation of ethical standards and by unworthy conduct, to be no longer worthy of being recognized as an officer of the courts.

In order to justify a court in disbarring an attorney, it is not necessary that his offence should constitute a contempt or a crime; or that he should be convicted of the crime or contempt before the disbarment.

While the power of disbarment should be exercised with great caution, yet where the respondent has been found guilty of unprofessional conduct involving moral turpitude and of misconduct affecting his character and standing as an attorney, and especially where he had manifested no signs of regret and retracted nothing, the courts will not hesitate through sympathy for the individual, to protect themselves from scandal and contempt and the public from prejudice, by striking such person from the roll of attorneys."

As I said *In re Rosenkrans, 94 Atl. Rep. 42* (at *p. 45*):

"The supreme court (*In re McDermit, 63 N. J. Law 476*), reprobates the breach of that highest trust and confidence which obtains between counsel and client, under which a duty to observe the strictest integrity in his dealings with a client is enjoined, and disbarred a lawyer who had been unfaithful to the instructions of his clients, obtaining from them money for which he failed and neglected to render any adequate service, and retained for his own use money which he had received from them for another purpose."

Our supreme court (*In re Cahill, 66 N. J. Law 527*) held that disbarment is justified for "such intentional fraud upon the court or a client as shows evidence of moral turpitude."

In *People* v. *Salomon, 184 Ill. 490*, the court quotes from *Sharswood's Essay on Professional Ethics*, as follows:

"There is no class of men among whom moral delinquency is more marked and disgraceful than among lawyers. Among merchants, so many honest men became involved through misfortune that the rogue may hope to take shelter in the crowd and be screened from observation. Not so the lawyer. If he continues to seek business, he must find his employment in lower and still lower grades, and will soon come to verify and illustrate the remark of Lord Bolingbroke that, 'the profession of the law, in its nature the noblest and most beneficial to mankind, is in its abuse and abasement the most sordid and pernicious.'"

Still another matter—one which has been hinted at but not descanted upon—is Hahn's oppressive conduct toward Kase. True, Kase was not Hahn's client, but his client's adversary. Nevertheless, he had rights which Hahn was bound to regard. One was to deliberate as to whether or not he would pay the enormous demand made upon him or resist the collection of it. He asked for time to think it over but was told that the money had to be paid that afternoon or night or the papers would be sent to Trenton and get there early the next morning, when he would be exposed.

In *Thornton on Attorneys, § 295*, it is laid down:

"An attorney's liability does not end with being answerable to his client. He is also liable to third persons who have suffered injury or loss in consequence of fraudulent or tortious conduct on his part."

In *Schalk* v. *Kingsley, 42 N. J. Law 32*, it was held:

"While an attorney-at-law acts merely in the character of attorney, making use of the process of the law to enforce his client's demand, however groundless and vexatious it may be, he is not liable to suit. But when he steps beyond that, and actively aids his client in the execution of his purpose, he is not shielded from responsibility."

In *the Matter of Hutson, an attorney, 127 N. Y. App. Div. 492*, it was held:

"It is improper for an attorney-at-law to send communications to persons against whom he has claims to collect in such a form as to lead to the impression that an action had been commenced or that legal proceedings are pending to collect the claim. Such methods are strongly disapproved and require discipline, whether adopted by an attorney, or, under his name, by a collecting agency that he authorizes to use his name."

Hahn, as already observed, had no instructions from Peaker to collect $25,000 to settle the divorce suit or a *crim. con.* action; his instructions were to bring a proceeding for divorce; but, even if his instructions were to get money for the settlement of the cause of action, whichever it was to be, Hahn had no right by threats of exposure to extort $25,000 from Kase in Peaker's name. If an attorney who writes to a third person, in an endeavor to collect a claim from him, that he had brought suit for his client, when in fact he had not, may be disciplined, as we have seen, how much more reprehensible and deserving of discipline was Hahn's conduct in demanding that Kase raise an enormous sum of money after banking hours to prevent the immediate commencement of a divorce suit in which he had drawn no papers, and when, as we have seen, he went to the bank with Kase and insisted that the money be drawn and turned over to him, which was done. This course, it seems clear, was taken by Hahn because he knew that if the matter was allowed to rest over night and Kase took counsel there would be small likelihood, indeed, of his (Hahn's) scheme succeeding.

Upon this whole matter I am clearly of opinion that Hahn has shown such a want of professional and personal honesty as to render him unworthy of the confidence of the court or the public, and he should, therefore, be disbarred; and his guilt is heightened by his bold defence of his indefensible conduct. If the court were to put the seal of its approval upon this nefarious transaction, and let this solicitor go acquit, then the public—the third party to this proceeding, whom the court is bound to protect—might well despair of protection from the fraud of unconscionable and designing lawyers.

It is, of course, with great reluctance that I have come to this conclusion. The solicitor is a prominent practitioner of the law

and has been a judge and a legislator. These things, however, may not deter me from the performance of a solemn duty. I have studied the case deeply, both on the facts and the law, and, from whatever angle I have viewed it, the guilt of the accused was all apparent.

Let an order be entered debarring the respondent from further practicing as a solicitor or counselor of the court of chancery.