Sometime before and on May 3d 1932, a petition was presented to the chancellor setting forth among other things that on April 12th, 1932, upon the filing of an affidavit, an order was made, advised by Vice-Chancellor Church, removing Harry G. Hendricks as one of the receivers of the Earl Radio Corporation, upon the allegation that the receiver had embezzled large sums of money belonging to the said receivership estate. Since then proceedings have been had in this court for money to be paid out of the surplus fund belonging to this court for the purpose of financing the investigation.
A cursory investigation of Hendricks' account showed that he had embezzled approximately the sum of $149,000 and Vice-Chancellor Church made an order removing him from the Earl Radio receivership and from some twenty or more cases in which he had also been appointed receiver. The averments were sufficient to cause an investigation and Charles L. Carrick, Esquire, was appointed master and directed to conduct it.
On May 2d 1932, an order was presented to me on behalf of the State Bar Association providing for such investigation in this court and appointing Mr. Carrick as advisory master to conduct the investigation but it contained no appropriation for the expenses of the examination. I added the words "but at the cost of the State Bar Association unless the legislature shall make appropriation therefor."
I did this because all investigations in New Jersey, of which I knew, had always been prosecuted through a legislative committee at the public expense, namely, that of the legislature; but this was to be a judicial investigation which lent handle to the view that the expenses were payable out *Page 236 
of any unappropriated judicial funds and this surplus fund belonging to the court was available, if lawful. This brings us squarely to the inquiry as to whether or not the expenses of the investigation may be paid out of this chancery fund.
The legislature was in session, but adjourned shortly thereafter, without having made any appropriation for the purpose. Suggestion was then made that the surplus money belonging to the court of chancery might, in part, be used for the liquidation of these expenses but that a judicial determination of the right of the chancellor to make the appropriation should be requisite to any such diversion of funds. Whereupon, a petition was presented praying for the allowance of such a fund of $7,359.78 from the surplus money belonging to this court to pay the expenses of the investigation then incurred.
Whereupon, an order to show cause was made, directed to the state comptroller, state treasurer and the attorney-general, why the prayer of the petition should not be granted. On the return day of the order, August 9th, 1932, the attorney-general said that the comptroller and treasurer both disclaimed any interest in the fund under the statutes of this state or otherwise and would file a disclaimer. They were directed to do so.
The attorney-general is a party hereto as such attorney-general. It arises out of his representing, as law officer, the public in all matters of trust which are not private, and this is certainly a public trust. In Lanning v.Commissioners of Public Instruction, 63 N.J. Eq. 1, 8, it was held that: As that was a public trust, the attorney-general, representing the public, was a necessary party to the litigation. The general practice seems to be that a bill of this sort in a matter of a public trust is filed by the attorney-general, either of his own motion, or on the relation of some parties interested. In that case the parties interested presented the bill and made the attorney-general a party defendant thereto. No objection to this course having been made by the attorney-general, I think the proper parties were before the court, and that it was immaterial that the attorney-general was a defendant *Page 237 
instead of a complainant. That was the view taken by the Massachusetts supreme court in Harvard College v. Society,c., 69 Mass. 258, and it accords with reason.
The allegation of the payment of excessive fees to solicitors,c., by some vice-chancellors was certainly grave enough and serious enough to cause this investigation to be at once made as the practices reported were of a character to discredit honesty of purpose and show a tendency to reward counsel beyond his deserts, in other words, it amounted to an obstruction of justice and the diversion of funds of suitors and litigants, persons entitled to the assets, which should have gone to their true owners, and the investigation so far as it has proceeded has amply justified the wisdom of the court's ordering the inquiry.
It is averred that the money belongs to the court to be used at the discretion of the chancellor for equitable purposes. This is one of them. This brings us to the question of whether the court owns the money in a qualified legal sense and that its payment is subject to the discretion of the chancellor, for the time being, for proper and lawful purposes. These questions are to be answered in the affirmative. The hearing on this order has shown a perfect mine of wealth of legal principles, to the effect that the court has jurisdiction, that the money being in court is subject to its control and subject to the appropriation of the court for lawful purposes (see Matter of Stevenson, (N.Y.)137 App. Div. 789) or the protection of the court and it self-preservation.
The attorney-general himself claimed in his argument and brief that the legislature's refusal to appropriate any funds of the state for the expenses of the investigation was a conclusive determination of the non-existence of any necessity or emergency justifying the expenditure of the public funds.
Whether or not there is a necessity or emergency justifying this court in using the public funds for the purposes of investigation belongs to the judicial department of this state to determine for itself that fact. See The State v. The Governor,25 N.J. Law 331 (at p. 349), to the effect that each department of government exercises the functions necessary *Page 238 
for its self-preservation independent of the other departments. The fund arose in this way: It is to be found in the report of Oscar Keen, master as to such accounts of this court from January 1st, 1908, to January 1st, 1909, he said inter alia, "as hereinbefore stated, the true balance in said banking company, to the credit of the court of chancery on January 1st, 1909, was the sum of $808,165.96. If there is deducted from the sum of $808,165.96 the amount with which the clerk is chargeable on January 1st, 1909, that is, the sum of $780,709.82, there remains a balance of $27,456.14 to the credit of the court of chancery on January 1st, 1909, in the Trenton Banking Company, being the result of compound interest allowed by the banking company, which does not belong to persons interested in the fund on deposit, but to the court of chancery, to be disposed of by this court agreeably to equitable rules. Respectfully submitted to his honor the chancellor, this twenty-second day of March, nineteen hundred and nine. Oscar Keen, master, approved, Mahlon Pitney, C."
And the present chancellor has added these interpretations:
In the broad sense in which this term (equitable rules) is sometimes used it signifies natural justice. 1 Bouv. Dict.
(Rawle's Rev.) 1057. Equity is according to him who is chancellor. Lord Selden. Webster's New International Dictionary,p. 742. Equity is natural justice or right; the giving, or desiring to give, to each man his due, according to natural law.Webster's New International Dictionary, p. 742.
To show how Honorable Mahlon Pitney, chancellor (who was a very illustrious chancellor of New Jersey and thereafter an equally illustrious justice of the supreme court of the United States), interpreted this report and the assertion that the surplus fund of $27,456.14 belonged to the court itself, to be disposed of by this court agreeably to equitable rules, it is only necessary to cite the case of Moran v. Gott (26-794), in which, on February 27th, 1912, an order was made that the sum of $1,071.03, which had theretofore been inadvertently paid to the solicitor of Anna A. MacDonald, one of the parties, and which the said solicitor and the court *Page 239 
were unable to recover from her, should be charged against the expenses of this court, and credited to the account of Mary A. Alcorn, to whom it belonged and to whom it was subsequently disbursed.
Here was a practical application of the appropriation of $1,071.03 according to equitable rules in favor of Mary A. Alcorn, whose money to that extent had been inadvertently paid to another, from whom it could not be recovered back.
The present chancellor followed the rule in a few cases, paying small fees to solicitors doing work for the court itself, notably the case of In the Matter of Simon Hahn, a Solicitor of theCourt of Chancery (Docket 40, page 174), 84 N.J. Eq. 523;85 N.J. Eq. 510. The case was this: Charles S. Peaker having retained Simon Hahn, a solicitor in chancery, to bring a suit for divorce against his wife, Bertha Peaker, for adultery committed with Charles Kase, Hahn drew the petition and immediately went to Kase, the co-respondent, and told him what had occurred, and informed him that unless he paid $25,000 of hush money to settle the matter the petition would be filed the next day and Kase be thus exposed. Kase raised and paid the money. Hahn informed Peaker that he had settled with Kase, not telling the amount that he received, but giving him $2,000; and also paying the Gregory Detective Agency, who had obtained evidence, $9,000, making $14,000 for Hahn. One year afterward Peaker and the detectives discovered the amount received by Hahn, and upon Peakers' demand for more money Hahn gave him an additional $2,500, making $4,500 in all, and gave the detectives, upon their demand, an additional $1,250, making the solicitor's share forty-one per cent., and the detectives' forty-one per cent., and the client's whose cause of action they exploited for their own benefit, only eighteen per cent. Held, that this conduct on the part of Hahn, the solicitor, toward his client, was unconscionable, oppressive and fraudulent, and that, therefore, he should be debarred from practicing as a solicitor; and such an order was made. This man after trial was disbarred in chancery (although that was reversed but not for the reason that he had *Page 240 
acted unconscionably and dishonestly) and the late Halsey M. Barrett as counsel for the court received a fee and costs amounting to $267.15 for the work of prosecution.
This court and every other constitutional court has the inherent power in this state to exert all necessary and appropriate power to function free from destructive and pernicious acts.
Chief-Justice White in Toledo Newspaper Co. v. UnitedStates, 247 U.S. 402 (at pp. 416, 419), established the boundary of inherent powers of constitutional courts. He said: "The test of power is in the character of the acts in question: Whether their direct tendency is to prevent or obstruct the free and unprejudiced exercise of the judicial power." He further said: "The court has the sacred obligation to preserve their right to discharge their duties free from unlawful and unworthy influences and in so doing, if need be, to clear from the pathway leading to the performance of this great duty all unwarranted attempts to pervert, obstruct or distort judgment."
This inherent power includes the right to use the public funds if necessary for the court to perform its judicial duties, and is a logical consequence of the reasons justifying the power itself and is also established in cases in this country. See Mercer v.Coleman, Auditor, c., 14 S.W. Rep. 2d 144 (at p. 145), a Kentucky case decided in 1929 by the court of appeals in that state. The question before the court was whether the house of assembly having the constitutional duty to decide upon the membership of the house had the inherent power without the concurrence of the senate or approval of the governor to use the public funds in investigating the conduct of the election so that the house could decide intelligently the contest.
The court upheld the power of the house to use the public fund and mandamused the auditor to certify to the resolution of the house.
In McConnel v. Gallet, 6 Pac. Rep. 2d 143 (at p.144), held, that the governor's power to proclaim martial law implied the power to incur expenses to pay the national guardsmen. *Page 241 
The auditor was, in this case, ordered to audit and pay the expenses of the guardsmen.
In Moreau v. Freeholders of Monmouth, 68 N.J. Law 480 (atp. 481), Mr. Justice Dixon cites the case of Board ofCommissioners of White County v. Gwin, 136 Ind. 562, as declaring that constitutional courts have the inherent power to provide themselves with necessary accommodations temporarily but the court decided that the necessity for the exercise of such power did not exist in that case then before it as adequate accommodations had been provided by the county.
My conclusion is this: That whether or not the courts have the right to exert inherent power depends upon the facts of the particular case. See Marshall v. Gordon, Sergeant-at-Arms,243 U.S. 521, and that in this case now before me I hold the facts are of sufficient gravity to make it my sacred duty to use the funds under my control under the power which is vested in me to promote this investigation.
Ordered that the order to show cause be made absolute and that the money prayed for be appropriated and paid for the purpose aforesaid, out of the accumulated fund belonging to this court.
Order accordingly.